# IN THE COURT OF APPEALS OF IOWA

No. 19-1600
Filed September 2, 2020

**DOUG KNOTEK,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**CYNTHIA MELLIN,**
        Defendant-Appellant/Cross-Appellee.
_____

        Appeal from the Iowa District Court for Pottawattamie County, Kathleen A.

Kilnoski, Judge.

        The mother appeals the modification of the legal custody and physical care

of the parties' minor children; the father cross-appeals the child-support obligation.

**AFFIRMED AS MODIFIED ON BOTH APPEALS AND REMANDED.**

        Norman L. Springer, Jr. of McGinn, Springer & Noethe, P.L.C., Council

Bluffs, for appellant.

        Joseph J. Hrvol of Joseph J. Hrvol, P.C., Council Bluffs, for appellee.

        Considered by Tabor, P.J., and May and Greer, JJ.

**GREER, Judge.**

The war has not yet ended in a case that began with combat over the children. Hopefully, for their children's sake, the parents will someday put down their weapons. Here both parties appeal the modification decision of the district court. The mother, Cynthia Mellin, appeals the award of sole custody and physical care to the father of their twins,[1] Doug Knotek. She asserts Doug did not prove he could provide superior care for the children justifying a change in custody and physical care, the district court afforded too much weight to the findings of the child custody evaluator and, alternatively, Doug failed to preserve his appellate request for child support. Doug complains the district court misunderstood his position on waiving the child-support obligation and requests appellate attorney fees.

**A. Procedural Background and Facts.**

Procedurally, the current iteration of this case began with Doug's July 2018 application to modify legal custody and physical care of the parties' twin daughters. After a three-day trial, starting in May 2019 and ending on a day in August, the district court determined that Doug proved a substantial change in circumstances since the last modification in November 2017. But in reality, this ongoing sparring arises from frustration involving poor communication and many unfounded child abuse investigations. At the time of the filing of the initial order for child custody, visitation, and support in March 2014, Doug resided in Council Bluffs and Cynthia had moved to Ottumwa. Since then the transfer for visitation occurs in West Des

---

[1] The children were born in 2011. Doug and Cynthia never married, and each had other older children. From their previous marriages, Doug fathered two sons and Cynthia had four children—all older children still resided with their parents.

Moines.  Only Cynthia's mother (Nana) handled the exchanges because Cynthia claimed fear of Doug.  At the beginning of their custody arrangement, the twins visited Doug every third weekend, plus fourteen extra days in June and in August, along with the usual holidays.

But four months after the original order, Cynthia applied for a modification of the custodial and visitation provisions, alleging that one of Doug's sons from an earlier marriage had inappropriate contact with one of the twins.[2]  The stepbrother was age twelve and the twins were age three.  Doug responded by requesting a change in physical care of the children to him and filed for contempt of court.  He outlined Cynthia's efforts to deny him contact with the children.  Then, Cynthia withdrew her modification request.  In the June 2015 trial on Doug's application, the court found Doug failed to establish a substantial change in circumstances, but it expanded his visitation by adding a July week of visitation and clarified issues surrounding other forms of access to the children.  The district court also found that Doug proved a prima facie case for contempt against Cynthia, reserved ruling on the contempt for 180 days and required her to pay $1000 towards Doug's attorney fees.  At the end of the 180 days, the court fined Cynthia $100 for her prior contemptuous behavior, noting that minor issues between the parties were ongoing but the actions supporting contempt—withholding visitation—had ceased.

True to form, the conflict continued.  In July 2016, while the twins were at Doug's, another DHS investigation into alleged inappropriate touching by the

---

[2] A 2014 Iowa Department of Human Services (DHS) investigation revealed that at the time of the alleged abuse Doug claimed the stepbrother was out of town. The DHS concluded the report of abuse was unfounded.

stepbrother started. Cynthia applied for immediate return of the children, asserting Doug refused to return the twins and that he took them to a doctor without notice to her.[3] The court ordered Doug to return the children. But during the 2016 DHS investigation that involved interviews with a doctor and a forensic evaluation at Project Harmony, the twins reported their mother told them to lie about the allegations surrounding their dad and the stepbrother. Again, the DHS report was unfounded. During this same investigation, the twins reported that Cynthia "hit them on their privates," lies all of the time, and tells them to lie about their father. Doug told the investigator he was concerned about the twins' safety because their mother was the type of person who would "drive off a bridge and drown her children." These allegations were also unfounded.

At the end of this same year, Cynthia moved to suspend the parenting time of Doug because of allegations of inappropriate contact and abuse between one of the twins and the stepbrother. Asserting that the children were "hysterical" before a visit to Doug's home and that Doug was telling them to lie, Cynthia also added physical abuse by Doug's son to the allegations. DHS again investigated the list of concerns. None were confirmed after the investigation. The court denied Cynthia's request to suspend Doug's parenting time. There was also an allegation of physical abuse and injury to the ear of one of the twins by the stepmother. The injury had occurred a year earlier and that report was also unfounded.[4] In May

---

[3] Doug alerted the doctor about the abuse allegations. The doctor interviewed the children alone— although Doug was present at the clinic—and noted in the report her suspicion that mom was "coaching" the twins. The twins reported no abuse at this visit that Doug initiated.

[4] The medical report describing the ear treatment referenced both ears and did not discuss any injury caused by any person.

2017, another investigation started after a report of sexual abuse by the stepbrother against one of the twins. Counseling by the parents was recommended but never accomplished.

In these various filings, both parents accused each other of coaching the children. Many interviews with the twins revealed inconsistencies and denials. Investigators from various agencies from various locations interviewed, observed, and concluded that abuse could not be confirmed—making all allegations unfounded.[5] Then, with some quiet before the next storm, in November 2017, the parties entered into a Stipulated Order of Modification increasing Doug's Facetime contact with the twins.

That calm ended after February 2018, when another claim of sexual abuse by the stepbrother was investigated by DHS. This investigation closed quickly when the children denied any abuse. In April 2018 yet another allegation of abuse by the stepbrother was made. The twins also alleged that they were pushed down the stairs by Doug, the stepbrothers, and stepmother. None of the physical injuries were confirmed and, while the children discussed a sexual encounter with the stepbrother, the allegations were unfounded. During this investigation Doug alleged that the children were not even living with Cynthia but with their grandmother. Doug asserted that the Nana and Cynthia coached the children and, to protect his son, he had placed a video camera near the girls' bedroom door to prove no one had entered the room in the evening. Oddly, some physical symptoms referenced in Cynthia's allegations of abuse appeared to be the result

---

[5] From 2014 forward, Doug relates a history of thirteen or more reported allegations of abuse, all were unfounded.

of treatments she provided the twins. This report was also unfounded. Yet another report surfaced at the end of May 2018. Then in June 2018, Doug requested an immediate return of the children after being denied both his Father's Day weekend and his three-week summer visitation. Cynthia raised, yet again, allegations about Doug's son and one of the twins. DHS commenced an investigation. The district court ordered the return of the children to the father but restricted contact between the stepbrother and the twins pending the investigation. To rebut the allegations, Doug produced surveillance footage of the area outside the twins' bedroom to prove no one entered their room during the weekend evenings when the alleged abuse occurred by the stepbrother and asserted that for most of the weekend he and the twins attended an out-of-town wedding. That report was unfounded.

During all the years of allegations, these parents placed their hatred of each other over and above the emotional health of the twins. The children's therapist of two years diagnosed the children as having an adjustment disorder based on the stress experienced between the parents' homes. Cynthia refused all contact with Doug, alleging he had been abusive to her. The parents only communicated by email correspondence. As the years continued, they exchanged moronic emails about details that typically are easily managed. Cynthia demanded Doug not call the twins on her phone but get a phone for the children to use. Doug, angry about Cynthia's nicknames for the children that had been used for eight years by friends, family and the school, alerted Cynthia he refused to use those names.[6] Cynthia

---

[6] In the depositions of these eight-year-old twins, when asked what name they preferred, they offered the shorter nicknames.

made the twins stay at Nana's home after visitations with Doug because she claimed it was too hard for her to hear the twins' reports of abuse.

With yet another investigation pending,[7] in July 2018 Doug filed to modify custody or physical care of the twins asserting these changed circumstances involving Cynthia's behavior: (1) she made many false claims of abuse, (2) she acted to frustrate Doug's relationship with the twins, (3) she wrongfully denied his visitation, and (4) she neglected the emotional and psychological needs of the children. Cynthia countered by agreeing there were changed circumstances but she requested sole custody of the children with no contact between her and Doug except through a third party. She also requested several changes to Doug's access to the twins, including requesting supervised visitation with a mental-health professional. Given these issues, the district court appointed a child custody investigator. During the proceedings, the child custody investigator authored reports to the court.[8]

After the May trial days but before the trial ended in August, with the recommendation of the investigator, the district court removed the twins on a temporary emergency basis to Doug's home. The district court also required the parents to attend counseling to address their communication dysfunction.[9] And

----

[7] Other allegations of abuse followed throughout this proceeding—in October 2018, January 2019, and April 2019—but all were unfounded.

[8] The first report was filed May 6, 2019, and after interviewing additional witnesses, an addendum report was filed May 15, 2019. Because the district court required a psychological examination of Cynthia, the trial suspended for several months and the child custody investigator authored yet another addendum report addressing the twin's status between June and August 2019.

[9] Cynthia arranged counseling with a Des Moines counselor, but after two meetings the counselor declined to participate and noted that Doug had an

the court mandated that Cynthia obtain a psychological evaluation. After the evaluator concluded that Cynthia was well adjusted, had no psychological disturbance, but suffered from situational adjustment disorder with depressed mood, the trial testimony concluded in August.

Following the detailed investigation of the child custody investigator, the district court awarded Doug sole legal custody and physical care. The district court limited Cynthia's visitation to one weekend per month, two summer weeks of visitation, the normal holiday visitation, video chat time twice each week, and any other time agreed upon by the parents.

We now address the issues on appeal.

**B. Analysis.**

We review the district court's ruling on an application to modify de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). The best interests of the children is the "controlling consideration." *Id.* (citation omitted). "Even though our review is de novo, we give weight to trial court findings of fact, especially when considering credibility of witnesses. As difficult as it is to assess credibility of live testimony, it is more difficult to assess credibility from a cold transcript." *In re Marriage of Woodward*, 228 N.W.2d 74, 75 (Iowa 1975) (quoting *Zaerr v. Zaerr,* 222 N.W.2d 476, 477 (Iowa 1974)).

---

alternative plan. Doug failed to follow though by getting the appointments scheduled. The parents never completed the court-ordered counseling.

*1. Was it appropriate to change custody and if so, is the award of sole custody to Doug warranted?*

To begin, Cynthia disputes the district court decision in several areas. Both sides had argued changed circumstances warranted a change in the existing custody arrangement. Cynthia argues an award of sole legal custody to Doug is inappropriate and abandons her own request for sole legal custody. On appeal, Cynthia now argues a return to the status quo of joint custody with physical care to her. She emphasizes that Doug cannot minister to the children's needs more effectively than she, that it is not in the best interests of the twins to modify physical care to Doug, and, finally, that the district court relied too heavily on the child custody investigator's report.

To change the custodial provision of a custody order, the applying party must establish by a preponderance of the evidence that conditions since the last order have so materially and substantially changed that the children's best interests make it expedient to grant the requested change. *In re Marriage of Frederici,* 338 N.W.2d 156, 158 (Iowa 1983); *see Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005) ("[S]ection 600B.40 grants the district court authority to determine matters of custody and visitation [with unmarried parents] as it would under Iowa Code section 598.41 [for once-married parents]."); *see also Braunschweig v. Fahrenkrog*, 773 N.W.2d 888, 891 n.3 (Iowa 2009). The parties modified the initial order in 2015—the court added a summer week of visitation— and in 2017—added additional Facetime contact by agreement. Even before 2017, the parties communicated only through email with accusatory and unbending positions and several child abuse allegations were lodged against

Doug's son.  But the district court found Doug met his burden to show changed circumstances in 2019.  The district court rationale for its substantial change in circumstance finding was:

> The court at the time of the initial decree and subsequent modifications could not have foreseen the multiple unsubstantiated reports alleging that Doug, his [older child] and his former wife sexually and physically abused the children.  The allegations have not abated and have never been confirmed, despite the children's years of counseling and despite their ability to communicate much better at the time of trial than when the initial report was made when they were three years old.

Without question, everyone agreed the both parents' acrimony created tension for these young children.  Describing the central conflict, the court offered:

> The court is firmly convinced that the children think their mother wants them to report that [stepbrother] and Doug have physically and sexually abused them.  The court is firmly convinced that the children think their father wants them to report that [stepbrother] and Doug have never been inappropriate.

The twins' therapist of two years contended that the twins' behavioral issues result from the conflict about co-parenting and stress between both homes.  Continued acrimony, over and beyond the general tension found in custody matters, can serve as a basis to modify custody.  Tension between the parents is a factor in determining if a custody modification is appropriate.  *In re Marriage of Stanley*, 411 N.W.2d 698, 701 (Iowa Ct. App.1987) (citing *In re Marriage of Krebsbach*, 395 N.W.2d 189, 191 (Iowa Ct. App.1986)).  We agree that Doug met the burden to show a substantial change in circumstances.

But there is another hurdle to clear before custody is modified.  Doug must show a superior ability to minister to the twins' care over Cynthia's ability.  *See Frederici,* 338 N.W.2d at 158.  "The party seeking to modify a [custody order] thus

faces a heavy burden, because once custody of [children] has been fixed, 'it should be disturbed only for the most cogent reasons.'" *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (quoting *Frederici*, 338 N.W.2d at 158). "In determining which parent serves the child[ren]'s best interests, the objective is to place the child[ren] in an environment most likely to bring the[m] to healthy physical, mental, and social maturity." *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996).

Here we have the benefit of a child custody investigation, hundreds of pages of exhibits, testimony from many witnesses. But on a key concern of the case the district court noted "[w]e may never know the truth about whether there was ever an inappropriate touch by [the stepbrother]." Then the reasons discussed by the district court for changing Cynthia's physical care status were:

> "[t]he court acknowledges that many of the allegations of abuse were reported by people other than Cynthia. However, Cynthia's admitted unwillingness to hear the children's reports of abuse first-hand, her refusal to read DHS and law enforcement investigations because it was too hard for her, and her blindness to helping the children to protect themselves from abuse mean she is not fit to be their sole legal and physical care parent."

The "catch-22"[10] is apparent. As part of its rationale for change in custody, the court faulted Cynthia for her role in the reporting of abuse yet condemned for her inaction. This discussion complicated our review of the case.

With no direct confirmation of abuse, the district court returned to problems with the "multiple unsubstantiated reports" of both sexual and physical abuse that "have not abated" as the reason for the change in circumstances proved by Doug.

---

[10] The paradoxical rule in the novel *Catch-22* by Joseph Heller for which the only solution to a problem is denied by a circumstance inherent in the problem.

The district court confirmed that Doug was not the abuser and that he made certain the stepson had limited contact with the twins. And many times the twins retracted their reports, suggesting that their mother and grandmother coached them to lie about their father and stepbrother or just that the abuse never happened.[11] In our de novo review, we also combed through the detailed exhibits offered as evidence to arrive at a decision as to which parent can more effectively minister to the twins' needs.

Despite the accountability of each party for the conflict, the court found that further counseling between the parents would not solve their rift even though they attended only two appointments. Given the serious acrimony and the continuous stress of investigations over five years of the twins' lives, the district court ordered that Doug should have sole legal custody and physical care to monitor the health

---

[11] Finding the truth here is gut-wrenching. As noted, many times the one or both of the twins reported stories that seem inconsistent, contained words that were not age appropriate, and suggested the reported behaviors were made up. Yet some retractions about the abuse occurred close to visitations with Doug. Once, after a report of abuse, DHS interviewed the children in Doug's home, which may have not yielded an accurate account. One twin reported a worry that her dad would get mad if the investigator disclosed what was said. Another time, the twin expressed fear if told about the report that Doug would hurt the cat and that they had seen the stepbrother kill the guinea pig. The DHS investigator also allowed Doug to interview the twins about the abuse without letting the children know the investigator was listening but did not use that same investigation format with Cynthia and the twins to hear what they might say to her. The twins' therapist advised DHS she believed the allegations and the DHS interview techniques would not promote disclosure. This same therapist observed the twins "shaking" as they discussed their father in therapy after visits. While there are no founded reports by DHS, the school principal, who had a three-year relationship with the twins, testified she believed the child's description of abuse. And, interestingly, while being deposed for this case, both twins denied that the mother had ever told her to tell people that the stepbrother "did something" to the other twin. When asked in the deposition where the twin wanted to live, she said, "I want to keep it the same."

and welfare of the twins. On his side of the parent ledger, the court cited his devotion to the children and their lack of anxiety around him supporting his bond with the twins. Witnesses reported the twins appeared excited and comfortable being with Doug. We learned the twins enjoyed the visitation activities at Doug's home. Yet the district court determined that Doug was not a perfect parent either.[12] And hints of Doug's "my way or the highway" mindset in the parents' email exchanges, the use of the children's formal names, and his abrupt and demanding expectations with both Cynthia and DHS give us pause. Along that same line, we know little about Doug's parenting skills with the children in his home other than Doug has not had success meeting the educational and medical needs of his older child.

On the flip-side, all of Cynthia's witnesses described her as a wonderful mother with a strong bond with these twins and her other children. To her credit, the four older children were doing exceptionally well under her care. She encouraged extracurricular activities for the twins, and everyone reported they did well educationally. The twins' therapist noted they were well-balanced as they transferred care at the end of 2018. And Cynthia had "riding time"[13] as the physical

---

[12] In Doug's sole care provider role over the short time frame between trial dates, he was unable to have the twins complete their Ottumwa school homework by year-end and he refused to allow the twins to participate in the final national dance competition they started in Ottumwa because the twins' "safety" was his primary concern. He denied a request by Cynthia to adjust her visitation so she could retrieve the twins in Council Bluffs on her way to Colorado to visit the oldest half-sibling at an honor's camp, saying, "[w]e need to stick with the court ordered visitation schedule for now."

[13] "Riding time" is a time advantage in wrestling resulting in extra points for the wrestler in control.

care provider over the past eight years. During a 2018 abuse investigation with one twin through the University of Iowa, the doctor related:[14]

> I asked her which home she liked best, she identified her mom's house. At her father's house, the most favorite person is her twin . . . . She stated she played with [her twin] at her father's house since nobody else played with them there. At her mother's house on the other hand, she didn't have a favorite person since she liked them all. However, at some point, she stated her mother was her most favorite person.

During this same time frame, in a DHS interview, one twin reported that both parents want the twins to live with them, yet when at the father's house, she "misses her momma and that makes her sad . . . but she knows she will go back to her momma's house." In one of the investigative interviews, the young twins offered their preference for interacting with their mom and her older children. We presume that siblings should not be separated. *See In re Marriage of Pundt*, 547 N.W.2d 243, 245 (Iowa Ct. App. 1996). Keeping the half-siblings together weighs in Cynthia's favor. *See In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 480 (Iowa 1993) (noting that siblings, including half-siblings, should be separated only for the most compelling reasons). But there are half-siblings at Doug's house to consider as well. And there is support in the record that the twins had positive feelings about their half-brothers.

But even the twins' therapist noted that something had to be done to relieve the twins' stress. So, since both parents contribute to the acrimony, the critical

---

[14] The doctor also noted that the twin may get "great attention and feel for me" after reporting abuse, but "no affirmation of non-sexual events at dad's." Yet the University of Iowa doctor found the twin to be credible for the most part. Other DHS notes suggest both parents feed into the children's needs for attention and approval.

question is whether Cynthia manipulated the twins to report abuse to interfere with the relationship between them and Doug. And can Doug minister more effectively to the health and well-being of these children? We believe the answer to both questions is yes. While witnesses for Cynthia relate that she and the father of her older children co-parent without stress and those children are healthy and happy, Cynthia cannot even be in the same room as Doug. The investigators were less supportive of Cynthia's parental skills. For example, the child custody investigator testified:

> Cynthia has either purposely or not purposely manipulated certain circumstances and continuing to subject these kids to all of these forensic interviews, and rape kits, and asking for the—wanting the school to put cream on their privates when they don't need to. I mean, I don't believe that the kids should be subjected to this stuff any longer. I think that they have been through enough with—it's common hand for them to talk to investigators. I don't think that that's healthy for a small child to think it's normal to be going in for forensic interviews and for physical examinations of their private parts.

Under the description about Doug, the custody investigator commented that the twins seemed happy at Doug's home. She interviewed their stepbrother and found him credible with no issues. Interviews included the various DHS workers, a law enforcement investigator, and the children's long-term counselor. All reported the children told them either their mother or their Nana told them to lie about their dad and half-brother. Likewise, it also made no sense that Cynthia read none of the investigation reports, would not attend any of the forensic interviews of the children (especially when Doug was going), and often would not have the children in her home when these allegations arose. That behavior could reveal she did not believe that the reports were real. And according to Doug, his son was not in the home when some of the allegations occurred. Doug also suggested to the twins

that the stepbrother's bedroom had been painted orange when it had not, to show that when the twins reported the room was orange their reports were fabricated. Finally, Cynthia tended to overstate details that were later shown to be untrue, such as her allegation that one of the twins was the bleeding from her ear when the actual medical record of treatment did not support that condition.

Arguing the district court relied too heavily on the investigator's testimony and reports, Cynthia postures the investigator failed to remain impartial and was unfair in the investigation by allowing Doug more opportunities in the process. And the district court confirmed it "relied on the child custody investigator's observations of the children with their parents." To support her viewpoint, Cynthia cites the failure to interview the children in her home and the chance to ask the children about their changing stories with her present as Doug was allowed to do. Although the investigation report addresses negative behaviors related to coaching by the maternal grandmother, the investigator never interviewed her. Finally Cynthia was surprised the twins' teachers were not questioned. Calling out the reliance on the "flawed" investigation, Cynthia urges us to overlook the findings and conclusions. But we note the district court disagreed with the investigator's call for supervised visitations and so did not rely only on the report. *See Bowlin v. Swim,* No. 19-1021, 2020 WL 2988537 (Iowa Ct. App. June 3, 2020) (affirming the ruling of the district court where, after the father objected to the admission of the report, the district court noted the child custody evaluation was helpful but not outcome determinative and placed only limited weight on the report). And on our de novo review, we give less deference to the investigator's findings as well. All interviews with the children occurred in Doug's home city with no visit to Ottumwa to meet

those half-siblings or view that home with the twins. With all the interviews in Council Bluffs, in the eyes of such young children, torn between loyalties, the impression that the father controls the proceedings could exist.

Here, the acrimony between these parents creates a situation in which joint custody cannot succeed. *See In re Marriage of Gensley*, 777 N.W.2d 705, 714 (Iowa Ct. App. 2009) (finding the parents' utter inability to communicate with each other because of a toxic relationship was an overriding factor weighing against joint legal custody). We agree with the district court that consideration of the statutory factors weighs against joint legal custody. There is compelling evidence that Cynthia, while she might not have directly reported abuse, attempted to deny Doug's participation in the twins' lives. *See In re Marriage of McCord,* No. 03–0497, 2003 WL 23219961, at *6 (Iowa Ct. App. Nov. 26, 2003) (stating mother correctly believed initial allegation of daughter but mother's credibility was adversely affected by child's later inconsistent statements and the admission the mother told her the child to say the father was the perpetrator). The continuous investigations set up barriers to visitation for Doug, and the forensic interviews are stressful for the twins. And since the last modification in 2017, the abuse reports intensified. *See In re Marriage of Winnike*, 497 N.W.2d 170, 174 (Iowa Ct. App. 1992) (finding a mother's commitment to pursuing unfounded allegations of sexual abuse employed self-help tactics to keep the child from the father).

On our de novo review of this record, we agree that the continuous unfounded abuse reports operates a significant emotional harm to these children. Cynthia's past performance signifies her desire to interfere with Doug's relationship with the children. "In family law matters, past performance is a strong indicator of

what is yet to come." *Hensch v. Mysak,* 902 N.W.2d 822, 825 (Iowa Ct. App. 2017). We defer to the district court's assessment of the parties and conclude the district court's factual findings were fully supported by the record. *See Gensley*, 777 N.W.2d at 715; *see also In re Marriage of Will,* 489 N.W.2d 394, 399 (Iowa 1992) (providing that the denial by one parent of the child's opportunity to have meaningful contact with the other parent is a significant factor in determining custody or physical care (citing what is renumbered as Iowa Code § 598.41(1)(c) (2018)). Cynthia's behavior in seeking to place Doug in an unfavorable light is serious and should not be tolerated. *See In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215–16 (Iowa Ct. App. 1994) (noting false allegations of abuse as relevant in establishing a change in circumstances); *In re Marriage of Winnike*, 497 N.W.2d 170, 174 (Iowa Ct. App. 1992) (discussing significance of false sexual abuse allegations made by the mother).

Here, "[d]etermining what custodial arrangement will best serve the long-range interest[s] of [the children] frequently becomes a matter of choosing the least detrimental available alternative for safeguarding the child[ren]'s growth and development." *In re Marriage of Winter*, 223 N.W.2d 165, 167 (Iowa 1974). So left with a quandary, we find Doug has the slight edge over Cynthia, but we warn each parent that the responsibility for this toxic behavior rests on both of them. We affirm the award of sole legal custody and physical care to Doug. Yet we consider whether there is a solution to the stress the twins face. We are left with the impression that the toxic relationship between the parents will continue to impact these children even under Doug's care. Along with other professionals, the child custody investigator noted:

> I believe that they—yes, they need counseling with a neutral therapist or counselor that will include both parents, and will listen to everybody, and will work with these kids so that these kids will tell the truth to everyone and stand up for what's right and we can put some of this behind us. And hopefully they can grow up in a normal environment with two healthy relationships with their parents.

Noting that a previous court order that was never fulfilled required the parents to attend counseling, we modify the order to again require the parents to attend counseling to address their toxic relationship in parenting these children. We also note that this counseling was recommended on various occasions throughout the investigations of the alleged abuse. The counseling should continue until the counselor considers it is no longer necessary and should occur at least monthly.

We also consider the close bond between the twins, their mother, and the Mellin half-siblings. We modify the district court order to allow visitation every other weekend and another week in the summer, just as Doug exercised, with the same meeting point.

Finally, we afford these parents this sage advice that transcends the test of time:

> Even though the parents are not required to be friends, they owe it to the child to maintain an attitude of civility, act decently toward one another, and communicate openly with each other. One might well question the suitability as custodian of any parent unable to meet these minimum requirements. Problems are likely to develop under any custodial arrangement. The adults must have the maturity to put their personal antagonisms aside and attempt to resolve the problems.

*In re Marriage of Bolin*, 336 N.W.2d 441, 447 (Iowa 1983).

*2. After informing the district court he would not seek child support if awarded custody, can Doug now, for the first time on appeal, request entry of an order for child support?*

Doug argues he preserved error on the issue of child support by argument to the court, through the order on the modifications, and by appealing. *See Lee v. State*, 815 N.W.2d 731, 739 (Iowa 2012) (commenting that the purpose of our error-preservation rule is to give "opposing counsel notice and an opportunity to be heard on the issue and a chance to take proper corrective measures or pursue alternatives in the event of an adverse ruling."). A notice of appeal does not preserve error on an issue. *See* Thomas A. Mayes & Anuradha Vaitheswaran, *Error Preservation in Civil Appeals in Iowa: Perspectives on Present Practice,* 55 Drake L. Rev. 39, 48 (Fall 2006) ("However error is preserved, it is not preserved by filing a notice of appeal."). Nor did he move to reconsider, enlarge, or amend to lodge the claim he now raises on appeal following the court's order. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). But there was evidence at trial about Doug's rationale for waiving child support, and the court did rule on that issue. *See Lamasters v. State*, 821 N.W.2d 856, 863 (Iowa 2012). So we address his child-support claim. But even if error had not been preserved, Doug's effort to wager the parent's duty to pay child support against his request for sole custody is not a game the district court should sanction.

During the trial, Doug testified that if granted physical care, he would forgo child support.[15] To complicate the issue, Doug offered no exhibits alerting the court

---

[15]The following exchange took place during Doug's testimony at trial:

Q. Because of that are you suggesting to the Court that—as you did earlier that there's no child support obligation; is that right?
A. Yes, if that's what's, you know, going to happen, that I would—
Q. Because she'll have to do transportation and stuff which will be expensive. A. There will be a burden on her that I would like to lessen.

to the amount of Cynthia's income or reflecting his earnings so that a child-support obligation could be calculated. While there may be reasons to avoid the child-support obligation, we start with the requirement of every parent to support their children unless compelling circumstances warrant a deviation from the child support guidelines. Iowa Code §598.21B(2)(d). That statutory directive confirms that "[a] variation from the guidelines shall not be considered by a court without a record or written finding, based on stated reasons, that the guidelines would be unjust or inappropriate as determined under the criteria prescribed by the supreme court." *Id*. However the court may consider statutory factors when the guidelines require judicial discretion or the guidelines award would be unjustified or inappropriate. Criteria used to consider a deviation from the guidelines are whether "substantial injustice would result to the payor, payee or child or if adjustments are necessary to provide for the needs of the child and to do justice between the parties." *See* 2 Marlin M. Volz Jr., 2 *Iowa Practice Series: Methods of Practice* § 31:26 (Aug. 2020 Update) (providing factors considered in setting child support).

Here, the district court identified no rationale or finding to support a deviation from the child support guidelines.[16] And under this record, we find none. "The purpose of the guidelines is to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children

---

[16] The only reference to the child support obligation in the modification order is:

> Doug testified that if the court awarded him primary physical care, he would not seek any child support from Cynthia and would continue to provide the children with health insurance. The court agrees. To the extent that this is a deviation from the child support guidelines, the court approves the deviation.

in proportion to their respective incomes." Iowa Ct. R. 9.3(1). After all, child support provides for the children's needs and under the best interests for the child standard, we are not inclined to allow parents to "bargain away [the] child's right to support." *See Webb v. Iowa Dist. Ct.*, 416 N.W.2d 95, 98 (Iowa Ct. App. 1987) (noting that waiving child support may constitute an agreement injurious to the best interests of the child, making it invalid for any purpose.). Thus, we remand the case for a determination of Cynthia's child-support obligation under the child-support guidelines at the time of that hearing. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 37 (Iowa 205) (remanding for "modification of the [parent's] child support obligation based on the present financial circumstances of the parties and the child support guidelines).

*3. Is Doug entitled to appellate attorney fees?*

Doug requests an award of appellate attorney fees. When considering whether we should exercise our discretion to award appellate attorney fees, we examine "the needs of the party seeking the award, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005); *see also* Iowa Code § 600B.26 ("In a proceeding to determine custody or visitation, or to modify a paternity, custody, or visitation order under this chapter, the court may award the prevailing party reasonable attorney fees."). Because the record contains no information about the earnings of either party, we decline to speculate about the ability to pay and award no appellate attorney fees.

**C. Conclusion.**

We affirm the district court determination finding a change in circumstances warranting the grant of sole legal custody and physical care to Doug.  We modify the order to add more time to Cynthia's visitation and to require counseling.  We remand for a hearing and determination of Cynthia's child-support obligation.  We decline to award appellate attorney fees.

**AFFIRMED AS MODIFIED ON BOTH APPEALS AND REMANDED.**