# IN THE COURT OF APPEALS OF IOWA

No. 21-0092
Filed September 22, 2021

**DYLAN C. DUNLAP,**
     Plaintiff-Appellee,

**vs.**

**KRISTA A. SHEPPARD,**
     Defendant-Appellant.

_____

Appeal from the Iowa District Court for Floyd County, DeDra Schroeder,

Judge.

A mother appeals the district court order awarding the father physical care

of their son and requiring her to pay child support and cash medical support.

**AFFIRMED.**

Sarah A. Reindl, Mason City, for appellant.

David H. Skilton of Cronin, Skilton & Skilton, P.L.L.C., Charles City, for

appellee.

Considered by Tabor, P.J., and Greer, J. and Doyle, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2021).

**GREER, Judge.**

When the district court characterized its physical care decision as "difficult," it was because there was no confidence either parent could put the child's interest before their immature battles. After reviewing this record, we understand that dilemma. After ending their relationship in January 2019, Krista Sheppard and Dylan Dunlap agreed to joint physical care of their child. Their inability to co-parent led the district court to award physical care to Dylan in December 2020. From that ruling, the court ordered Krista to pay monthly child support and cash medical support. Krista now appeals, asserting she should be awarded physical care or, in the alternative, joint physical care. She also contends her support obligations should be adjusted based on her health insurance coverage available through her employer and Dylan's annual income without deductions. Both parties request appellate attorney fees.

After considering the relevant factors and the child's best interests, we agree with the district court that Dylan should have physical care. We decline to second-guess the court's determination of child support and cash medical support given the lack of proof that it was wrongly decided. Lastly, we find that both parties should pay their own appellate attorney fees.

## I. Facts and Prior Proceedings

Krista and Dylan are the unmarried parents of five-year-old C.D. Krista also has an older daughter, M.H., who stayed with her grandfather after C.D. was born because of her strained relationship with Dylan. According to Krista, Dylan treated M.H. poorly when they lived together. Once, he "threw away all of her toys and belongings" to punish her for bad behavior.

When the parties separated, Dylan moved in with his grandmother in Rockford and has resided there since then.[1]  A month later, Krista began dating her old coworker, Nathan, and moved to Charles City with C.D. and M.H.  At that time, Krista and Dylan informally agreed to share physical care of C.D.  Krista worked early morning hours during the week, so C.D. generally stayed overnight with Dylan and his grandmother.  They provided daycare for C.D. while Krista was at work.

Dylan has been unemployed since 2014 after a work-related injury caused him to lose functionality in his right arm.  He suffers from complex regional pain syndrome that makes it difficult to perform physical tasks.  He receives workers' compensation benefits as his sole source of income.  Because of his disability, Dylan's grandmother has helped with the caregiving responsibilities.

For the first few months, Krista and Dylan struggled with co-parenting.  They could not agree on a parenting schedule.  They failed to communicate pick-up and drop-off times for C.D.  Because of their lack of communication, Dylan's grandmother facilitated their visits with the child.  When Krista moved to Charles City, Dylan became less cooperative because he did not want C.D. spending time alone with M.H. or Nathan.[2]

---

[1] Dylan's grandmother was seventy-five years old at the time of trial and, as a registered nurse, worked as a private care-provider.

[2] Dylan pointed out to the court that Nathan had a no-contact order against him from 2018 for sending threatening text messages to his ex-girlfriend, but it had expired by the time of the custody trial.  No evidence was presented as to any current issues with Nathan and the ex-girlfriend.  He also urged M.H. posed a safety risk to C.D. due to her mental-health history involving threats of self-harm, but the district court noted M.H. presented no present concerns.

Unable to resolve their disputes, Dylan petitioned to establish his paternity as well as custody and support of C.D in April 2019. After a hearing, the district court entered a temporary order establishing a parenting schedule with Krista parenting every Sunday to Tuesday, Dylan parenting every Tuesday to Thursday, and then alternating parenting time from Thursday to Sunday. The court added: "The parties may agree to any appropriate parenting schedule provided that the parenting time is roughly equal." Responding to Dylan's concerns, the court ruled that Krista had to be present at all times when C.D. was around M.H. or Nathan. As for child support, the court considered the relevant guidelines and ordered Krista to make monthly payments of $230 starting in July. Despite the formalized shared-care arrangement, the discord between Krista and Dylan got worse.

In November 2019, Krista obtained a protective order against Dylan, prohibiting him from directly communicating with her through the custody trial. That summer, the court amended its temporary order to allow M.H. and Nathan to be around C.D. without Krista's supervision. The court also determined that C.D. should attend preschool in Charles City.

By the time of trial, Krista and Nathan were married and seeking to buy a four-bedroom house together. Krista had a new job making $29,700 per year. After two days of hearing evidence, the court awarded Dylan physical care. But the court called it "a difficult decision," noting it "[did] not have great confidence that either parent [could] truly put their child's interest to the forefront and recognize

and promote that child's relationship with the other parent."[3]  For that reason, the court rejected the possibility of joint physical care.

At the end of the day, the court believed Dylan provided "greater stability" for C.D.  The court found neither parent "particularly credible" but suggested that Krista prioritized her new relationship over ensuring her children were safe and stable.  In contrast, the court recognized that "Dylan's focus is on raising his son." After deciding physical care, the court ordered Krista to pay $465 per month in child support, an increase from the $230 that she had been paying, and an additional $123 per month for cash medical support.  Both parties were responsible for their own attorney fees.  Krista appeals.

## II.  Scope and Standard of Review

We review an order establishing a child's custody and support de novo. *Thorpe v. Hostetler*, 949 N.W.2d 1, 4–5 (Iowa Ct. App. 2020).  Under this standard, we give weight to the district court's fact findings, especially on the credibility of witnesses, but they do not bind us.  *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014).

## III.  Analysis

### A.  Physical Care

Krista first argues the district court erred in awarding physical care to Dylan. She claims she is in a better position to raise C.D. into "a decent human being and successful adult" because they share a strong bond.  She also emphasizes that

---

[3] We also support the district court's admonishment: "Dylan is strongly cautioned that he and his family need to actively promote the relationship between the child and his mother and need to take a less rigid approach to co-parenting."

C.D. and M.H. have a positive sibling relationship. If she does not receive physical care, she asks for an award of joint physical care. When resolving physical-care disputes, our primary consideration is the child's best interests. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). In deciding whether joint physical care is in the child's best interests, we consider "an overriding interest in stability and continuity, the degree of communication and mutual respect, the degree of discord and conflict . . . , and the extent to which the parties agree on matters involving routine care." *Id.* at 700.

Applying those factors, we agree with the district court that joint physical care is unworkable when "neither parent shows a particular aptitude toward promoting the child's relationship with the other parent." Even with court intervention, the parties have repeatedly failed to establish an equal parenting schedule because of their inability to communicate and animosity toward each other. Text messages reveal disagreements about basic day-to-day decisions, including pick-up and drop-off times, daycare, and overnight visits. Beyond those disputes, Krista contacted law enforcement several times during the proceedings to report Dylan for harassment and assault. The court found those allegations not credible, noting "Krista [was] prone to exaggeration of even the most minor incidences." Given the totality of these circumstances, the refusal to award joint physical care is the right course.

Having rejected that alternative, we must then decide which parent to award physical care of C.D. *See In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007). We give considerable weight to factors such as "continuity, stability, and approximation." *Hansen*, 733 N.W.2d at 700. We also seek to preserve sibling

relationships, including half-siblings, if it serves the child's best interests.  *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986).

Krista insists that she is better able to meet the child's day-to-day needs because she has been the primary caregiver "while Dylan relied on his . . . grandmother or mother to care for C.D. during his parenting time."  We disagree.  Since the parties' separation, Dylan has provided the majority of the child's care because of Krista's demanding work schedule.  Indeed, by her own testimony, Krista acknowledged missing twenty-nine overnight visits within a six-month period in 2019.  During that time, Dylan stepped up and maintained the child's daily routine.  Despite his physical limitations, the record shows Dylan has been more than capable of meeting C.D.'s physical and emotional needs.  In criticizing his family's involvement, Krista fails to recognize her own reliance on Dylan's grandmother when arranging visits with C.D.  We hesitate to rebuke the long-term caregiving role of a grandparent when both parents have benefitted from that expanded role.  *See Meller v. Hendrickson*, No. 19-1096, 2020 WL 374565, at *3 (Iowa Ct. App. Jan. 23, 2020) (discussing the positive role grandparents can provide in the raising of a child).  In sum, stability and continuity weigh in favor of awarding Dylan physical care.

Those factors also override the interest in keeping C.D. and M.H. in the same household.  While it appears the half-siblings are close and enjoy spending time together, in reality, they have lived separately for most of C.D.'s life.  Plus, the distance from Dylan's residence to Krista's home is only fifteen miles, so the half-siblings still can maintain their close relationship.  As the district court noted, C.D.'s best interests are served in an environment where "[he] has his own bedroom, has

a routine, and the family has structure and stability." Because that stability stems from Dylan, we affirm the award of physical care in his favor.

## B. Child Support and Cash Medical Support

Krista next asserts that the district court improperly calculated her child-support obligation by deducting attorney fees from Dylan's workers' compensation benefits for a yearly total of $11,229.12. According to Krista, his annual income should be fixed at $16,219.84.

But first, we note that Dylan contests error preservation, claiming Krista never asked the court to reconsider her child-support obligation. Because Krista briefed the issue of the workers' compensation calculation for the district court and the district court ruled on it, we find error was preserved. To file a rule 1.904(2) motion to reconsider on this issue would have only been for rehashing legal issues already presented and decided. *See Explore Info. Servs. v. Ct. Info. Sys.*, 636 N.W.2d 50, 57 (Iowa 2001) (noting post-trial motions are not appropriately used to "rehash legal issues raised . . . and decided adversely").

Workers' compensation benefits are included in the calculation for determining child support. *In re Marriage of Bales,* 380 N.W.2d 754, 755–56 (Iowa Ct. App. 1985). Dylan surrenders a portion of his workers' compensation benefits every month to his workers' compensation attorney, so the district court excluded the attorney-fee payments and calculated his annual income based only on the amount Dylan receives. Because Dylan does not have the use or benefit of these funds, we find the child support award analysis of the district court to be appropriate. *See In re Marriage of Andersen*, No. 02-1020, 2004 WL 573655, at *2 (Iowa Ct. App. Mar. 24, 2004) (concluding that justice required a one-third

reduction of the monthly workers' compensation benefits that went toward an attorney-fee lien to arrive at the father's income for child support purposes).

Krista also contends her monthly cash medical support payments do not accurately reflect a reasonable cost of health insurance for C.D.  In her motion to amend and enlarge the court's ruling, Krista asserted "that she can obtain insurance through her work discontinuing the need for cash medical support."  The court denied her request, reasoning she first needed to file proof of her current employer's health insurance plan before the district court would reconsider the cash medical support provision.  Despite that instruction, Krista did not offer that proof before filing this appeal.  We see no error in the court's determination.  Thus, on this record, we affirm the cash medical support order.

## IV. Attorney Fees

Both parties request appellate attorney fees.  Dylan specifically requests $3000 in appellate attorney fees.  An award of appellate attorney fees is not a matter of right but rests within our discretion.  *Hensch v. Mysak*, 902 N.W.2d 822, 827 (Iowa Ct. App.  2017); *see also* Iowa Code § 600B.26 (2019) ("In a proceeding to determine custody or visitation, or to modify a paternity, custody, or visitation order under this chapter, the court may award the prevailing party reasonable attorney fees.").  We consider several factors, including "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal."  *Hensch*, 902 N.W.2d at 827.  Although Dylan prevailed on appeal, Krista does not have a greater ability to pay for his legal representation.  Like the district

court handled trial attorney fees, we find that both parties should be responsible for their own appellate attorney fees.  We assess the costs of this appeal to Krista.

**AFFIRMED.**