# IN THE COURT OF APPEALS OF IOWA

No. 22-0594
Filed November 2, 2022

**AHMED ALA HUSSIN ALI ALIBRAHIMY,**
 Plaintiff-Appellee,

**vs.**

**KASONDRA LEE MASSENGALE,**
 Defendant-Appellant.
_____

Appeal from the Iowa District Court for Hardin County, Jennifer Miller, Judge.

The mother appeals the award of joint physical care. **AFFIRMED AS MODIFIED AND REMANDED.**

Joel C. Waters of Kaplan & Frese, LLP, Marshalltown, for appellant.

David R. Fiester of the Law Office of David R. Fiester, Cedar Rapids, for appellee.

Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Kasondra Massengale and Ahmed Alibrahimy started a relationship in 2013, but never married. They did, however, have two children[1]; one born in 2015 and one in 2016. After they ended the relationship in November 2018, their involvement with the children changed. Ahmed asserts that Kasondra moved to Ohio, leaving the children with him for over two months in 2019, and then came back and disrupted his custody plan by removing the children and not allowing him contact. Kasondra contended she was the primary parental figure for all of the children's lives and that, most compelling, Ahmed was not involved for the past several years on any consistent basis. At trial, Ahmed requested joint legal custody and joint physical care over the children. Kasondra agreed with joint legal custody but requested the district court award her physical care. The district court found Ahmed's position more compelling, and Kasondra appeals the award of joint physical care. We agree with Kasondra's position; we modify the district court's determination of physical care and remand for further proceedings to determine the appropriate child support.

The sole issue in this case turns on the determination of the custodial arrangement. Because custody matters are tried in equity, our review of these proceedings is de novo. Iowa R. App. P. 6.907. "[W]e examine the entire record and decide anew the issues properly presented." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). "Although we give weight to the factual findings of

---

[1] Kasondra's nine-year-old child from a different relationship also resides with her with no involvement by that child's father.

the district court, we are not bound by them." *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

At the time of trial, Ahmed was twenty-six years old and Kasondra was twenty-eight years old. Both acknowledged a rocky relationship in the distant past, but neither parent raised any recent conflict between the two.[2] In fact, after the couple's separation in 2018, Ahmed had little contact, essentially exercising sporadic visitation with the children, citing a busy schedule working at a dog food plant.[3] But in September 2019, Kasondra asked Ahmed to care for the children while she left the state of Iowa to attend to family issues in Ohio. Kasondra testified she was gone only a few weeks, returning at the end of October, but Ahmed testified he cared for the children until January 2020. After Kasondra's return, Ahmed requested that he retain primary care of the children. He testified he allowed Kasondra a weekend visitation and then she failed to return the children or allow him contact with the children after that point.

Kasondra's move of denying Ahmed contact prompted him to file a self-represented petition for custody in February 2020. Although there was an order requiring mediation, nothing happened and the district court filed a September order again requiring mediation or the petition would be dismissed. Now represented, Ahmed requested a hearing on temporary custody, child support, and

---

[2] Although Kasondra points to the earlier conflict as supporting the third factor in *In re Marriage of Hansen*—that the degree of conflict between parents should weigh towards the appropriateness of a joint physical care arrangement—her arguments actually go towards the second factor concerning the ability to communicate and show mutual respect. *See* 733 N.W.2d 683, 698 (Iowa 2007).
[3] At this plant, Ahmed testified he was working third shift from 6:00 p.m. to 6:00 a.m. But Kasondra testified he only had this job for a couple of months.

visitation. The hearing on temporary matters was set for December 2020. To comply with the earlier court order, mediation occurred in October 2020, but the parties could not come to an agreement.[4] The attorneys continued the hearing two times. A temporary hearing never was held, but there was a pending trial date set for June 2021. That trial did not occur on that date either. And in September 2021, the district court noted that while the trial was cancelled because the parties alerted the court to a settlement, no party had filed any stipulation. Ahmed's attorney of record requested she withdraw over a "breakdown in communication." The district court granted that request and then, noting the settlement had "fallen apart," reset the matter for trial. Trial took place in March 2022 with each party represented by the counsel who appear before us in this appeal.

Both parties concede that joint legal custody is appropriate, they only dispute the physical-care question. When deciding who should have physical care, we search the record for facts that resolve the issue not "upon perceived fairness to the [parents], but primarily upon what is best for the child[ren]." *Hansen*, 733 N.W.2d at 695. "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* "When determining who will have physical care of the child, we will consider 'stability and continuity with an eye toward providing the [children] with the best environment possible for [the children's] continued development and growth.'" *Meller v. Hendrickson*, No. 19-1096, 2020 WL 374565, at *3 (Iowa Ct. App. Jan. 23, 2020) (quoting *Hansen*, 733 N.W.2d at

---

[4] Ahmed testified that after the mediation he saw the children every other weekend for his visitation until he moved to Omaha in December.

700). "[T]he factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* (alteration in original) (quoting *Hansen*, 733 N.W.2d at 700). "These factors favor a parent who was primarily responsible for physical care of the children," though we examine each case's unique facts. *In re Marriage of Bain*, No. 07-0333, 2008 WL 4325499, at *3 (Iowa Ct. App. Sept. 17, 2008). Finally, when children are born of out wedlock, Iowa Code section 598.41 shall apply to the determination. *See* Iowa Code § 600B.40 (2020); *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974) (applying the factors to consider under section 598.41 when determining who should be the primary caretaker).

To evaluate what physical-care arrangement is in the best interests of the children, we review both the history and current status of these parents. At the time of trial, Kasondra was living in a mobile home in Eldora with her mother and grandmother, along with her three children, although she was looking to line up her own place. She was working close to a full-time schedule at a sandwich shop. Ahmed started a relationship with his girlfriend in October 2021, and at the time of trial he lived in a large house in Iowa Falls with his girlfriend, her child, and his twin brothers. The towns where the parents reside are close in distance. As of August 2021, Ahmed was working at a casino that is an hour away from his home. Explaining he has Sunday, Monday, and Thursdays off, Ahmed described his work hours as "weekdays that are not Fridays and Saturdays, I work from 5 p.m. to 3 a.m. And then on the Friday, Saturdays, I work from 8 p.m. to 6 a.m." So, on weekdays, with the hour drive tacked on to each side of his workday, Ahmed would not be available to care for the children from 4:00 p.m. to 4:00 a.m. and on weekends from 7:00 p.m. until 7:00 a.m. He testified the children go to school from

7:00 a.m. to 3:00 p.m., but according to Kasondra, they actually go to school at different times: the oldest goes from 8:15 a.m. to 3:30 p.m. and the youngest has classes from 12:30 p.m. to 3:30 p.m. And, Ahmed did not detail who would be watching the children while his work conflicted. Although he claimed he "would be able to" change his shift at work if needed, he made no effort to do so as of the date of trial.

While Ahmed lauded his parenting track record by explaining his care of the children when Kasondra went to Ohio, Kasondra painted a more comprehensive timeline. Kasondra testified that Ahmed had limited visitation, one weekend per month, from the time of their separation until September 2019 when she left for Ohio to handle family matters. She claimed she only left the children for a few weeks and returned in October 2019. Unlike Kasondra who has stayed in one area, the record reflected that Ahmed has lived in Iowa Falls, near the children, but also in several other towns not as close, including Omaha, Nebraska, before returning to the area in late July 2021. But more troubling, from when Ahmed left for Omaha in December 2020 because his step-dad kicked him out until he returned to the area, he did not exercise visitation with the children over those approximately seven months. Without contesting that history, Ahmed testified he maintained contact during this time over video calls when his step-dad occasionally had care of the children. According to Kasondra, after he returned in July 2021, Ahmed exercised visitation every other weekend for the next three or four months, with Kasondra providing the transportation.

But, at the March 2022 trial, Ahmed maintained he had last seen the children around the end of January and that Kasondra had stopped allowing

weekend visits in "late August, early October" 2021. Although, Ahmed blamed Kasondra for the time he was not spending with the children, noting that she "withheld the children and provid[ed] contact only on 'her terms,'" other than a request for a hearing on temporary matters that was never held, the record contains no evidence of efforts made by Ahmed to access more time with the children. And when pressed, Ahmed admitted the fifty-fifty schedule he advocated would "start something new right now and have a schedule that the children have not been used to for the past three and a half years."

As for communication between the parents, Kasondra indicated that Ahmed blocked her on his messaging application so she was unable to communicate with him until just before trial when she got access to Ahmed's cell phone number. And Ahmed had never taken the children to school and had not attended their medical appointments since 2019. He had not taken them to the dentist and did not know who their dentist was. The record did not show any efforts by him to stay in touch over important issues, such as the younger child's special needs or the children's schooling. *See Hansen,* 733 N.W.2d at 698 (noting that communication between the parents is a significant factor to consider in a joint physical care analysis).

At trial, Ahmed maintained that prior to Kasondra depriving him of visitation, they shared care of the children, but we find no evidence of that sharing of care for any sustained period of time over the lives of these children. Albeit, Ahmed did assume care of the children when Kasondra took leave to help family in Ohio, but that was short-lived. And, he emphasized that time frame as support for his "historic contribution to physical care in roughly the same proportion," but outside of that 2019 event, he offers no other evidence. Even assuming this primary care

role lasted a few months in 2019, depending on which version is believed, this is not supportive of a joint physical care award considering the children are now ages six and seven. We find it more compelling that in the three years before trial, Ahmed had little involvement in the care of the children. And in those last three years, we find no evidence in the record that shows Ahmed's involvement in the children's schooling or health care or his support or acknowledgement of the special needs of these children.

Contrast that evidence with the testimony over the mother's role. Kasondra proved extensive involvement with the children and their needs overall. She explained that one child had special needs to consider as that child is diagnosed with ADHD, night terrors, and learning disabilities and has to attend doctor appointments with a specialist every three to six months. She offered detailed examples of activities she did with the children, how involved she was with their schooling and healthcare, and how close the younger children were with their half-sibling. Kasondra made time with the children her priority; she testified:

> Oh, yes. So they're in my care when I'm not at work or when they're not in school. So it's just not really a scheduling thing. It's just I schedule myself around their schooling system. And then when they're not in school and I'm not at work, they're in my care.

Ahmed offered no testimony about his role in the day-to-day routine that involves the mental and physical health or social maturity of the children. So, in the children's lives, Kasondra has assumed the primary caretaker role. *See id.* at 697 (examining the concepts of stability and continuity under a principle of approximation, which holds "the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution").

There is no dispute that Ahmed loves his children and wants to maintain a close and supportive relationship with them; the concern is that he has yet to show he can provide care on a daily basis. This is not a dress rehearsal for that test, and we know that "imposing a new physical care arrangement on children that significantly contrasts from their past experience can be unsettling, cause serious emotional harm, and thus not be in the child's best interest." *Id*. We are unable to find facts or conclusions of law in this case that support a joint physical care arrangement. *See Hensch v. Mysak*, 902 N.W.2d 822, 825 (Iowa Ct. App. 2017) ("[I]n family law matters, past performance is a strong indicator of what is yet to come."). Instead, the principles of continuity, stability, and approximation favor granting physical care to Kasondra. *See Hansen,* 733 N.W.2d at 697.

As one of her reasons to grant physical care to her, Kasondra raises the point that she has full-time care of her older child, the children's half-sibling. She argues this factor weighs in favor for having physical care of the younger two children. *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986) (applying the principle of keeping children together to half-sibling relationships). "However, this principle does not mandate a parent with physical care of a half-sibling be awarded physical care of the child[ren] at issue despite other compelling factors militating against an award of physical care to that parent." *Van Gundy v. Bolton*, No. 18-1838, 2019 WL 2145848, at *3 (Iowa Ct. App. May 15, 2019) (collecting cases). Yet in this section of her brief, Kasondra failed to cite any authority so we do not address this factor. *See* Iowa R. App. P. 6.903(2)(g)(3) (providing that failure to cite authority in support of an issue may be deemed waiver of that issue).

We agree with the district court decision to order joint legal custody for these parents. But we reverse the determination of joint physical care. We find joint physical care is not warranted and that Kasondra should be awarded physical care of the two children with liberal visitation to Ahmed. *See* Iowa Code § 598.41(1)(a); *see also In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) (finding visitation rights are afforded to a parent who is not the primary caretaker). Our difficulty is that neither Kasondra or Ahmed argued for a specific visitation schedule for Ahmed before the district court or in the appellate briefs.

Thus, under our de novo review we find that the "General Parenting Schedule" crafted by the district court shall be changed to a visitation schedule of every other weekend for Ahmed and the children. If Ahmed cannot change his current work schedule to accommodate a weekend visitation from Friday after school until Sunday at 6:00 p.m. and has the current work schedule as described at trial, he shall exercise his visitation on Sunday, starting at 8:00 a.m. until Tuesday morning when school starts. Otherwise, if he no longer has those days off, the default visitation time shall be the every-other-weekend schedule. Ahmed shall be responsible for transporting the children to and from school if he is exercising his visitation. We are mindful that the district court established more extensive contact with the children for Ahmed under its custody plan, so we encourage Kasondra to allow one mid-week visitation that gives Ahmed the first option for care if Ahmed has time off work over such daytime hours to not interfere with the best interests of the children or their schooling.

The district court's holiday schedule (b) through (h), the summer visitation schedule for visitation, and the transportation plan remain as set in the order. All

other provisions in the district court's order relating to the expenses and care of the children shall remain unchanged, except that, using the annual income of the parties as determined by the court in the order, the district court should calculate the child support obligation of Ahmed, based upon the revised visitation schedule.

**AFFIRMED AS MODIFIED AND REMANDED.**