# IN THE COURT OF APPEALS OF IOWA

No. 17-0348
Filed September 13, 2017

**MANDY KAY HENSCH,**
      Plaintiff-Appellant,

**vs.**

**NICHOLAS ALLEN MYSAK,**
      Defendant-Appellee.
_____

      Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

      The mother appeals from a decree establishing paternity, custody, visitation, and support. **AFFIRMED.**

      Mark A. Simons of Simons Law Firm, P.L.C., West Des Moines, for appellant.

      Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee.

      Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**MCDONALD, Judge.**

Mandy Hensch and Nicholas Mysak are the parents of H.M., born in August 2014. Shortly after the birth of the child, Hensch and Mysak ended their romantic relationship. Although no longer in a romantic relationship, Hensch and Mysak cohabited until November 2015. At that time, Mysak moved out of the shared residence and into his own residence. In February 2016, Hensch filed this action to establish paternity, custody, visitation, and support. Although Hensch's prayer for relief requested sole legal custody and physical care of the child, the parties entered an agreement on temporary matters, agreeing to joint legal custody and shared care of the child. The parties exercised joint legal custody and shared care of the child through trial. Following trial, the district court entered its decree, making the temporary arrangement permanent and ordering Mysak to pay child support. Hensch now appeals. She seeks physical care of the child.

Our review of equitable proceedings is de novo. *See* Iowa R. App. P. 6.907; *Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001). We review the entire record and decide anew the factual and legal issues preserved and presented for review. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). Although our review is de novo, we afford deference to the district court for institutional and pragmatic reasons. *See In re Marriage of Morrison*, No. 16-0886, 2017 WL 936152, at *1 (Iowa Ct. App. Mar. 8, 2017). This means we give weight to the district court's findings of fact. *See In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015). This also means we will affirm the district court unless the district court failed to do substantial equity. *See In re Marriage of*

*Mauer*, 874 N.W.2d 103, 106 (Iowa 2016); *In re Marriage of Lukowicz*, No. 14-0088, 2015 WL 162089, at *4 (Iowa Ct. App. Jan. 14, 2015) (using substantial equity standard). In exercising our review, "[p]rior cases are of little precedential value, except to provide a framework for analysis, and we must ultimately tailor our decision to the unique facts and circumstances before us." *In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995) (citing *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992)).

When physical care is at issue, our primary consideration is the best interests of the child. *See* Iowa R. App. P. 6.904(3)(o). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Our case law provides "a nonexclusive list of factors to be considered when determining whether a joint physical care arrangement is in the best interests of the child." *In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007). "The factors are (1) 'approximation'—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parties; and (4) 'the degree to which the parents are in general agreement about their approach to daily matters.'" *Id.* (quoting *Hansen*, 733 N.W.2d at 697–99).

"Although petitioner and respondent were never married, no higher burden of proving fitness as a parent rests upon the father. The legal analysis employed in resolving a question concerning the custody of a child born of such a union is the same as that which would have been utilized if the child's parents had been

married and a dissolution of their marriage had resulted." *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). *See* Iowa Code § 600B.40 (2016) (providing section 598.41 shall apply in determining the visitation and custody arrangements of a child born out of wedlock). Where, as here, either parent requests joint or shared care of the child, if the district court "denies the request for joint physical care, the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child." Iowa Code § 598.41(5)(a). "[T]his passage does not create a presumption in favor of joint physical care." *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). It does, however, require a specific finding that joint physical care is not in the best interest of the child. *See* Iowa Code § 598.41(5)(a).

With the foregoing principles in mind, we turn to the present case. Shared physical care approximates the parties' prior care arrangement. Both parents took time off from work after H.M.'s birth to care for the child. The child lived with Hensch and Mysak from the time of his birth until November 2015, when Mysak moved out of the shared residence. The care arrangement between that date and February 2016 is unclear. However, from February 2016 through the time of trial, the parties exercised an agreed-upon shared-care arrangement. The arrangement has worked well. Both parents are gainfully employed and can support the financial needs of the child. The parents live in close proximity to one another, making transportation and exchanges easier. The child is thriving in the current care arrangement.

Hensch discounts the importance of the approximation factor in this case. She argues the arrangement has not been of long duration. We reject the notion that the care arrangement was not of sufficiently long duration to have significance in the case. Hensch and Mysak have exercised shared care of H.M. for all or almost all of his life. The arrangement has proven beneficial to the child. While past performance is not necessarily a predictor of future success, in family law matters, past performance is a strong indicator of what is yet to come. *See Hansen*, 733 N.W.2d at 696 (explaining "past caretaking patterns likely are a fairly reliable proxy of the intangible qualities such as parental abilities and emotional bonds that are so difficult for courts to ascertain").

At the time of trial, the parties' ability to communicate was strained. This weighs against an award of shared physical care. As in many cases of recent vintage, much of the communication conflict arises out of the parents' inability to stop sending each other electronic communication, particularly text messages. The district court aptly called this a "state of virtual cohabitation." The district court made several findings in this regard:

> The parties trade accusations regarding the extent and nature of their texting. In preparation for trial Nicholas had a friend analyze the number of the parties' text messages to show they were sending and receiving a similar number to and from each other. However, the sheer number of texts does not tell the entire story. In tone and substance, many of Nicholas' written communications to Mandy, though ostensibly about H.M., display a focus on Mandy. Nicholas' texts tend to be longer and they frequently devolve into attempts to draw Mandy into arguments or extended conversations. Additionally, Nicholas' texts tend frequently to be about, or include, references to his and Mandy's relationship.

The district court concluded that Mysak did not "bear[] all the blame" for the parties' communication issues:

> Some of Mandy's communications are condescending and dismissive of Nicholas' concerns when H.M. has been ill. Additionally, Mandy has not been flexible when Nicholas has made reasonable requests for additional time with H.M. although, again, some of Nicholas' requests for more time seem more focused on provoking argument and of painting a bad picture of Mandy than on a genuine desire for more time with H.M. Additionally, in texts Mandy often, even after Nicholas has pointed out that H.M. is both of their child, refers to H.M. as "my" baby or "my" child, understandably provoking anger and defensiveness in Nicholas. Finally, even though her texts are focused on H.M. when Nicholas has him, they are excessive and sometimes imply that Nicholas is not capable of caring for H.M.

The degree of tension or conflict between Hensch and Mysak is somewhat elevated. This is due, in no small part, to the parties' never-ending stream of electronic communication with each other. It is also due, in part, to the parties' perception of each other. The evidence showed Mysak kept a journal in preparation for trial. Mysak's journal revealed a critical and condescending attitude toward Hensch. It also showed Mysak portrayed himself in an overly flattering light. Hensch perceived Mysak to have a controlling attitude. She also perceived him to be immature. The district court acknowledged these difficulties but noted several mitigating factors that nonetheless supported an award of shared physical care:

> Nicholas testified that he is in a new relationship and hopes that Mandy finds a new relationship as well. This, if genuine, should help Nicholas get past the resentment and jealousy he feels as a result of the end of the parties' relationship. Second, the intense communication between the parties when H.M. is in the other party's care is undoubtedly attributable in part to his young age and the fact that he is each party's first child. Third, Nicholas' posturing, including his exaggerated journal writing is, hopefully, mostly attributable to his defensiveness and effort to convince the court he

can be a good parent and not emblematic of his personality in general.

Although cooperation and communication are essential in a shared-care arrangement, tension between the parents is not alone sufficient to demonstrate a shared-care arrangement will not work. *See In re Marriage of Stafford*, 386 N.W.2d 118, 121 (Iowa Ct. App. 1986). Instead, the communication difficulties and tension must rise above the not atypical acrimony that accompanies litigation in family-law matters. *See In re Marriage of Ertmann*, 376 N.W.2d 918, 920 (Iowa Ct. App. 1985). The communication problems and conflict in this case do not rise to this level. Moreover, the district court inserted several provisions in the decree related to "reform[ing] the nature and extent" of the parties' communication with each other. These included limiting the child's FaceTime conversations with the absent parent; instructing only the parent taking custody need be present at visitation exchanges if the exchange occurs at daycare; stating the "parties do not need to have daily, multiple, lengthy written conversations" about H.M.; and noting "it would be nice if the parties could be flexible and accommodating of each other when one requests some adjustment of the parenting time schedule." These measures seem appropriate under the circumstances. Finally, like the district court, we expect the parties' communication difficulties and conflict to dissipate as the parties become further removed from the intense heat of the litigation and trial process.

We finally consider the degree to which Hensch and Mysak are in general agreement about their approach in raising H.M. The record reflects the parents are both good parents and in general agreement regarding fundamental issues of

importance in raising the child. H.M. is the first child for both parents. They have both taken positive steps, together and alone, to be good parents. For example, Hensch and Mysak attended parenting classes, read parenting books, attended prenatal doctors appointments together, and sought out counsel from family and friends. The evidence shows the parties in fact can and do cooperate with each other on a regular basis on child-rearing matters. For example, they held a joint birthday party for H.M., which involved both sides of the family. They have attended appointments with each other after their separation. They also appear in general agreement regarding disciplinary matters.

In sum, the relevant factors weigh in favor of awarding Hensch and Mysak joint physical care of H.M. The continuity of the parties' caregiving relationship with the child strongly militates in favor of the award of joint physical care of the child. While the parties have had some communication difficulties and personal conflict, there is no evidence the communication difficulties or personal conflict interfered with their ability to act in the best interest of the child. *See In re Marriage of Schnitzler*, No. 14-0858, 2015 WL 800064, at *4 (Iowa Ct. App. Feb. 25, 2015) (finding parties' communication difficulties throughout divorce did not preclude award of shared physical care). Further, we expect the parties' communication difficulties and conflict to resolve once they move past this litigation and communicate less often. Finally, Hensch and Mysak both love and care for the child and are in general agreement regarding the upbringing of the child. There is no evidence showing joint physical care of the child is not in H.M.'s best interest. We thus see no reason to disturb the judgment of the district court.

Mysak requests appellate attorney fees. Appellate attorney fees are not a matter of right but may be awarded as a matter of discretion. *See* Iowa Code § 600B.26 ("In a proceeding to determine custody or visitation, or to modify a paternity, custody, or visitation order under this chapter, the court may award the prevailing party reasonable attorney fees."). In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal. Having considered those factors, we decline to award appellate attorney fees.

**AFFIRMED.**