# IN THE COURT OF APPEALS OF IOWA

No. 23-0374
Filed September 27, 2023

**KEVIN WILLIAM HIGDON,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**DAWN MARIE SHAFER,**
        Defendant-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Polk County, David Porter, Judge.

A mother appeals from an order placing physical care of her child with the father and assessing child support. The father cross-appeals the order for joint legal custody. **AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

Patrick H. Payton of Patrick H. Payton & Assoc., P.C., Des Moines, for appellant/cross-appellee.

Ryan A. Genest of Simpson, Jensen, Abels, Fischer & Bouslog, P.C., Des Moines, for appellee/cross-appellant.

Considered by Tabor, P.J., Buller, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BULLER, Judge.**

Dawn Marie Shafer appeals from a ruling placing physical care of her child with the father, Kevin William Higdon, setting visitation, and assessing child support. Shafer urges she should have been awarded physical care. Alternatively, she requests more visitation and contests the child-support calculation. Higdon cross-appeals, arguing the district court erred in awarding joint legal custody. We reject the appeal and cross-appeal, affirming the decree in its entirety.

### I.     Background Facts and Proceedings

Higdon and Shafer started dating around 2015 and never married. They had a child, S.H., in 2020. The parties broke up a few months after Shafer gave birth, but they did not enter into an agreement for custody, visitation, or child support at that time. Shortly after their separation, Shafer filed a petition for relief from domestic abuse alleging Higdon assaulted her. The district court dismissed the petition after a full evidentiary hearing.

That November, Higdon filed this paternity, custody, visitation, and support action. The court entered a temporary order granting Shafer physical care of the child. The following spring, Shafer began denying Higdon his court-ordered parenting time, claiming she believed Higdon was abusing the child. Higdon filed a contempt application, and the court scheduled a hearing for August 2021.

The day before that contempt hearing, police arrested Shafer for assault because she was throwing glass jars off her balcony and striking passersby. Based on this incident, Higdon believed Shafer's mental health was rapidly deteriorating, and he filed an emergency motion for change in custody seeking temporary physical care of the child. The district court granted that motion and

placed physical care with Higdon; the child remained with him through the contested custody trial. Higdon did not allow Shafer any visits or communication with the child between the emergency motion and the final ruling.

Shafer has significant mental-health problems and had been taking prescribed medication for seven years when she started dating Higdon. As the district court noted, it's difficult to describe Shafer's exact mental-health issues given her "unwillingness or inability to fully report those mental health struggles," including some false sworn statements. Regardless of her specific diagnoses, Shafer's mental-health problems seemed to be reasonably well-managed while she took medication, but she stopped taking medication when she became pregnant.

Shafer's mental health declined further after her separation from Higdon. Stemming from the glass-throwing assault and other incidents, the Iowa Department of Health and Human Service (HHS) issued a founded child abuse report against Shafer for denial of critical care and failure to provide proper supervision of the child. In contrast, any reports seemingly made by Shafer against Higdon were unfounded. In early 2022, officers arrested Shafer for third-degree arson for setting a dumpster on fire near her apartment. Her landlord sought to evict her on the basis that she was dangerous, and she pled guilty to misdemeanor reckless use of fire and moved out of the apartment to avoid eviction.

Shafer's mother and brother filed a petition to have Shafer involuntarily committed that September. Their affidavits reported she was not taking her medication, had cut off contact with her family, and was acting "very paranoid." The evaluating psychiatrist diagnosed Shafer with schizoaffective disorder and

bipolar type disorder, and opined that she likely met the criteria for major depressive disorder. She was stable and not symptomatic while on her medications. The commitment petition was dismissed.

Following a late-September hearing on temporary matters, the court formalized the emergency order placing the child in Higdon's physical care and ordered Shafer to complete a comprehensive mental-health evaluation before she would be allowed visitation. But Shafer did not meaningfully comply with the required evaluation.

At the time of the custody trial, Higdon worked at a blood center with a salary roughly equivalent to $24 per hour. Shafer worked part-time for a publishing company, earning $17.50 per hour. But she previously made between $18 and $19 per hour working full-time for an insurance company. And, according to Shafer, she was willing and able to return to full-time work.

At trial, Shafer claimed she had been off her medication without any problems for more than a year before she became pregnant. And she urged that her recent erratic behavior was caused by the pressure of "not knowing where [her child] is and anything about [the child]." She claimed she did not know why her landlord wanted her evicted after the arson incident. And she denied responsibility for both the arson and the glass-throwing. Shafer insisted she had no idea why her mother tried to have her civilly committed, but she also opined that her mother was likely telling the truth. She denied ever having a psychological or psychiatric diagnosis for which medication was recommended. And she testified that she had no interest in taking medication again. When asked by the court why she

disagreed with the diagnoses rendered by medical professionals, Shafer gave a minimally responsive answer that focused on how she does not "hear voices."

Shafer's mother and two of her brothers testified to concerns about Shafer's mental-health struggles and her non-compliance with medication. They agreed that Shafer "sometimes" acted paranoid and that her mental-health problems could affect her decision-making or parenting.

Following the custody trial, the district court ordered joint legal custody, placed physical care with Higdon, and granted Shafer limited supervised visitation. The district court emphasized Shafer's unwillingness to acknowledge her mental-health problems or seek treatment and explained that it was ordering supervised visitation based on a concern Shafer would not "voluntarily abide by those court orders with which she disagrees." The district court also ordered Shafer to pay child support in the amount of $447.33 per month based on Shafer's earnings capacity if she worked full-time at $18.50 per hour.

Shafer appeals, challenging the physical-care determination, visitation schedule, and child-support provisions. Higdon cross-appeals, challenging the imposition of joint legal custody.

## II. Standard of Review

"Our review of matters involving child custody and child support is de novo." *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020). "[W]e examine the entire record and decide anew the issues properly presented." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). "While we are not bound by the fact-findings of the district court, we give them weight, especially as to credibility determinations." *Thorpe*, 949 N.W.2d at 5.

**III. Discussion**[1]

The issues before us concern Shafer's challenge to the physical-care and visitation provisions of the decree, Higdon's challenge to joint legal custody, and Shafer's challenge to the child-support calculation.

**A. Physical Care and Visitation**

In deciding an issue of child custody and care under chapter 600B (2020), the controlling consideration is the best interests of the child. *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017); Iowa R. App. P. 6.904(3)(o); *see also In re Marriage of Brainard*, 523 N.W.2d 611, 614 (Iowa Ct. App. 1994). In determining physical care, this court considers several factors, including those set out in Iowa Code section 598.41(3) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). *See* Iowa Code § 600B.40(2) (providing "section 598.41 shall apply" to chapter 600B proceedings); *Stanley v. Winters*, No. 22-1552, 2023 WL 2396539, at *2 (Iowa Ct. App. Mar. 8, 2023). The overall objective in determining physical care is to promote the child's physical health, mental health, and social maturity. *In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). "The critical issue is which parent will do better in raising the child." *In re Marriage of Burkle*, 525 N.W.2d 439, 441 (Iowa Ct. App. 1994).

The gist of Shafer's argument on appeal is that her "mental health [is] being weaponized against her." We do not agree. The record abundantly supports that Shafer's mental-health problems were reasonably well-controlled before she

---

[1] We note the district court admitted some disputed evidence as a court's exhibit "for potential appellate review." Because neither party raised an evidentiary issue related to the disputed exhibit, we do not consider it.

decided to stop taking her medication. Even if we set aside Shafer's choice to stop taking medication while pregnant or breast-feeding, her refusal to acknowledge her mental-health conditions persisted through trial. There is no sign Shafer will meaningfully address her mental health now or at any time in the near future. This observation is not a weaponization of mental health; it is a weighing of the child-custody factors in light of a parent's unwillingness to address an illness that could pose a serious danger to the safety and welfare of the child.

Shafer also argues that Higdon "intentionally alienated [Shafer from the child] under the guise of mental illness." We do not read the record this way. Higdon sought sole custody and physical care through the appropriate legal channels. And his concerns for the child's safety were reasonable, as evidenced by the founded HHS child-abuse report against Shafer, as well as her arrest and prosecution for assault and arson. While we appreciate Higdon's hope that Shafer would never intentionally injure the child, we also understand why he is concerned that her refusal to acknowledge or treat her mental-health condition poses a danger to the child warranting limited supervised visitation.

Beyond Shafer's overt arguments, we also reject her implicit challenge to Higdon's suitability as a caretaker for the child. As a consequence of Shafer's erratic and criminal conduct, Higdon has been the sole caregiver for the child since August 2021. No witness expressed any credible concern regarding Higdon's parenting, including Shafer's mother and brothers. A daycare provider also testified that the child appears to be doing well. And there was credible evidence that, before the change in physical care, Shafer had intentionally denied Higdon access to the child based on her allegations of abuse that two different judges and

HHS determined were false or otherwise unfounded. *See* Iowa Code § 598.41(1)(c) ("The court shall consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."). This evidence supports the district court's decision on physical care.

To the extent Shafer argues for more generous visitation under different conditions than the district court established, we decline to modify the decree. Given Shafer's refusal to acknowledge or treat her mental-health problems and her past refusal to abide by court orders, we cannot disagree with the district court's choice to limit Shafer's parenting time.

We affirm the district court's placement of physical care with Higdon, including the provisions regarding limited supervised visitation for Shafer.

### B. Joint Legal Custody

In his cross-appeal, Higdon contests the district court's ruling on joint legal custody. He argues that Shafer will not work cooperatively with him to further the best interests of the child. Although the district court's explanation for awarding joint legal custody was terse, it provides a sufficient basis for appellate review given the facts adduced at trial and the district court's privileged position to observe the parties and evaluate their credibility:

> The court has no doubt that the parties have difficulty in communicating going forward. Those communications will be further complicated by respondent's beliefs, but this record cannot support the granting of sole legal custody in petitioner's favor and as such the court will award the parties joint legal custody.

As with other custody determinations, our review is guided by a flexible multi-factor statutory analysis. *See id.* § 598.41(3). While Higdon is correct that

many of the facts supporting the physical-care award *could* justify the award of sole legal custody, we decline to disturb the district court's ruling on this issue.

First, Higdon has proven somewhat reluctant to meet the custodial parent's obligation to support the other parent's relationship with the child through maintaining some contact—even in a limited fashion—between Shafer and the child. *Id.* § 598.41(1)(c), (3)(e). Next, we, the parties, and the district court all agree that difficulties in communication are likely. But difficulties in communication alone are not enough to grant a parent sole legal custody, particularly in light of Higdon's testimony that he did not think Shafer would ever intentionally harm the child. *See Hensch*, 902 N.W.2d at 826 ("[T]he communication difficulties and tension must rise above the not atypical acrimony that accompanies litigation in family-law matters."). And while Higdon may be correct that his past invocation of the court's tie-breaker function to address immunizations forecasts repeat issues in the future, we cannot say that with certainty on this record.

If Shafer continues to not acknowledge or treat her mental-health conditions, or her mental health declines further, she may prove unable to exercise joint legal custody and act in the best interests of the child in the future. But, like the district court, we are unwilling to grant sole legal custody at this point, and we find the best interests of the child support joint legal custody based on the present state of the record.

### C. Child Support

Last, Shafer challenges the child-support calculation because she believes the district court should have computed her income at twenty hours per week, rather than forty. We reject this argument. It is well-established that, in

circumstances of voluntary unemployment or underemployment, a "child support award may be based upon the party's earning capacity, as opposed to his or her actual earnings." *In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996). "We examine the employment history, present earnings, and reasons for failing to work a regular work week when assessing whether to use the earning capacity of a parent." *In re Marriage of Nelson*, 570 N.W.2d 103, 106 (Iowa 1997). As recently as 2021, Shafer had full-time employment at approximately the pay rate used by the court. Shafer herself testified she was capable of full-time work and intended to seek out full-time employment. We affirm the child-support calculation.

### IV.     Disposition

We affirm the custody decree in its entirety, rejecting the arguments made in both Shafer's appeal and Higdon's cross-appeal. Given the issues raised, we assess costs two-thirds to Shafer (for her appeal) and one-third to Higdon (for his cross-appeal).

**AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**