**IN THE COURT OF APPEALS OF IOWA**

No. 24-0178
Filed October 30, 2024

**CORY D. RANDALL,**
        Plaintiff-Appellee,

**vs.**

**NATALIE L. TRIER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Washington County, Michael Carpenter, Judge.

A mother appeals a custody order granting the father's request for joint physical care. **AFFIRMED.**

Dana A. Judas of Nazette Marner Nathanson Knoll LLP, Cedar Rapids, for appellant.

Thomas E. Maxwell of Leff Law Firm, L.L.P., Iowa City, for appellee.

Considered by Tabor, P.J., and Chicchelly and Sandy, JJ.

**CHICCHELLY, Judge.**

Natalie Trier appeals a custody order granting her and Cory Randall joint physical care of their child. She contends that she should be granted physical care. Because joint physical care between the parties is in the child's best interests, we affirm the district court's decision.

## I.    *Background Facts and Proceedings.*

Cory and Natalie never married but have one child together, H.R., born in 2021. While this custody dispute only involves H.R., substantial evidence at trial focused on C.R., the nine-year-old child Cory shares with his ex-girlfriend, Shelby. The two have thrived as co-parents despite the initial distance between their residences. Cory attended nearly all of Shelby's prenatal appointments, was present for C.R.'s birth, and shared caregiving duties with Shelby during the first two weeks of C.R.'s life. By the time C.R. was six weeks old, Cory was caring for C.R. overnight on his own.

When C.R. was approximately three years old, Cory sold his house and moved closer to where Shelby lived to spend more time with C.R. Although there is no formal custody arrangement, Cory and Shelby split custody of C.R., with Cory having C.R. "[s]ixty, might be seventy, percent of the time."

Sometime after Cory moved, Shelby introduced him to Natalie. Shelby thought the two would make a good match based on their "similar interests." Shortly after they met, Cory and Natalie began dating. A couple months later, Natalie became pregnant.

H.R. was born in August 2021. Cory was present for H.R.'s birth and took one month of paternity leave to help care for him. Natalie took between "six to

eight weeks off." Cory and Natalie shared caregiving duties during this time, but H.R. resided at Natalie's apartment because H.R. was breastfeeding. By the time H.R. was a few months old, Natalie and Cory had ended their romantic relationship and become "just friends." But in December 2021, Natalie expressed a desire for reconciliation. Cory disagreed because Natalie wanted more children, and he did not. Following this disagreement, Natalie limited Cory's time with H.R. Cory continued to ask Natalie for additional time with H.R. In the spring of 2022, to increase his time with H.R., Cory began working part-time at the same school as Natalie, which allowed him to pick H.R. up from daycare. This also allowed him to spend more time with C.R., who attended the school. At this time, Cory and Natalie's co-parenting relationship was amicable.

In May 2022, Natalie learned that Cory was dating someone else. After Cory confirmed that he had started a new relationship with Traci, Natalie immediately removed Cory from their work group chat and "let [him] know that she didn't want [him] to come to work." Cory complied and did not return to the school. Natalie also reduced Cory's three weekly visits with H.R. to two. Cory testified that Natalie "just became more controlling," especially with access to H.R., which worsened as time progressed.

One of Natalie's chief complaints about Cory's caretaking was the brand of diapers he used. Natalie claims that H.R. suffers from eczema, which is exacerbated by certain household or hygiene products. To alleviate any skin concerns, she is strict about H.R.'s diapers. Cory believes the rashes were caused by a dog allergy and testified that they ceased when the dog was removed from his home.

Cory continued asking for more parenting time, which Natalie often refused. The reasons she gave for denying Cory's requests ranged from not wanting H.R. around Traci, to H.R. being sick, to Cory asking "too late to take action." When Cory's schedule allowed him to have additional time during the week, Natalie did not allow him to take H.R. out of daycare, "believ[ing] it was more important to maintain H.R.'s routine than to give him additional time with his father."

By late 2022, things took a drastic turn. Natalie testified she heard that teenagers were "having margarita night or smoking marijuana, cooking marijuana into food" while at Traci's house. Upon hearing the rumors, she unilaterally restricted all visits with Cory. Alleging she was following the advice of the Iowa Department of Health and Human Services, which was not involved, Natalie allowed Cory only supervised visits with H.R. These visits could only occur at either her or her mother's home with a suitable supervisor present. Despite Cory's frustrations, he complied with Natalie's demands. Cory and Traci voluntarily underwent drug testing without being asked, which came back negative. Cory also asked his mother, an employee at the department, to supervise visits with H.R. and continued to make every effort to see him. Cory testified that the timing suspiciously coincided with him moving into Traci's house, and he felt Natalie was punishing him "because she [had] already punished me just for dating [Traci] or seeing her."

When Natalie restricted Cory's access to H.R., Cory petitioned for custody, requesting joint physical care. In January 2023, the district court issued a temporary order placing H.R. in Natalie's physical care and granting Cory visitation. After a two-day bench trial in October 2023, the district court granted

the parties joint legal custody and joint physical care of H.R. It also determined child support. Natalie appeals, arguing only one issue: that the court should have granted her physical care. Both parties also request appellate attorney fees.

## II. Review.

We review physical-care determinations de novo. *Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005). While we give weight to the fact findings of the district court, especially those regarding witness credibility, we are not bound by them. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007); Iowa R. App. P. 6.904(3)(g).

## III. Discussion.

### A. Physical Care Determination.

Natalie argues the court should not have granted the parties joint physical care because it was not in H.R.'s best interests. We do not resolve physical care issues "based upon perceived fairness to the [parents], but primarily upon what is best for the *child*." *Hansen*, 733 N.W.2d at 695. "The objective of a physical care determination is to place the child[ ] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695. To determine the best interests of H.R., we apply four specific considerations:

> (1) what has been the historical care giving arrangement for the child between the two parties;
> (2) the ability of the [parents] to communicate and show mutual respect;
> (3) the degree of conflict between the parents; and
> (4) the degree to which the parents are in general agreement about their approach to daily matters.

*In re Marriage of Dickey*, No. 12-1393, 2013 WL 1453067, at *5 (Iowa Ct. App. Apr. 10, 2013) (citation omitted). We consider each factor in turn.

The first factor, also called approximation, refers to the "historic patterns of caregiving." *Hansen*, 733 N.W.2d at 697. "In considering whether to award joint physical care where there are two suitable parents, stability and continuity of caregiving have traditionally been primary factors." *Id.* at 696. Natalie, of course, served as H.R.'s primary caregiver in the sense that Cory had no overnights with H.R. until the temporary order was entered. But while we consider Natalie's role a significant factor, "it is not an overwhelming factor mandating that she be awarded physical care." *In re Marriage of Berning*, 745 N.W.2d 90, 93 (Iowa Ct. App. 2007). First, the pattern of caregiving weighs less in Natalie's favor because both parents have worked full-time jobs, which required H.R. to attend daycare. *Id.* (finding that the approximation factor may be mitigated, depending on the parents' roles, if a child spends a significant amount of the day in childcare). Second, when we consider approximation, we do not make a mere quantitative calculation of hours spent together; instead, we look at the unique circumstances and intricacies of each family. *Hansen*, 733 N.W.2d at 697. While we do not grant custody based on the parents' behaviors, *see Dickey*, 2013 WL 1453067, at *2 ("We are additionally mindful of the admonition that custody is not to be awarded or denied to a parent as a reward or punishment for good or bad behavior."), we hesitate to credit Natalie as H.R.'s primary caregiver when her role resulted partly from denying Cory access to the child. *See In re Marriage of Frey*, No. 21-0448, 2022 WL 108952, at *2 (Iowa Ct. App. Jan. 12, 2022) ("We decline to allow a parent to unilaterally and unreasonably block the other parent's access to the child and then use that artificially created caregiving schedule as support for the parent's claim for physical care."). What is more important to our analysis is whether the

party requesting physical care has been an "active and interested parent since [the child's] birth." *Berning*, 745 N.W.2d at 93.

Based on the record before us, we find that Cory has established himself as a willing and enthusiastic parent. Several witnesses testified to Cory's parenting, describing him as "a very loving father," "a good dad," and "an amazing father." Witnesses further testified to Cory "always hugging [H.R.]" and "playing with him and giving him kisses and telling him that he loves him." They similarly testified to his participation in the less desirable aspects of parenting, such as feeding, bathing, diaper changes, comforting while sick, and "[g]etting up at odd hours." Cory has also consistently made sacrifices for H.R. by acquiescing to Natalie's sometimes unreasonable demands, working at Natalie's school to increase his time with H.R., and offering to provide additional care. Accordingly, despite Natalie providing the bulk of overnight caregiving, the approximation factor weighs in favor of joint physical care between the parties.

Second, we jointly consider "the ability of [the parents] to communicate and show mutual respect" and "the degree of conflict between parents." *Hansen*, 733 N.W.2d at 698. While the parties have had their disagreements, this is not a case involving overt harassment or allegations of domestic violence. *See generally id.* at 700 (considering "allegations of sexual improprieties and domestic abuse" in reversing joint physical care arrangement); *In re Marriage of Wedemeyer*, No. 23-0597, 2023 WL 6292335, at *3 (Iowa Ct. App. Sept. 27, 2023) (granting one parent physical care when the noncustodial parent communicated through "a consistent barrage of insults and profanities" or failed to communicate at all). Until recently, most of the parties' co-parenting relationship has been

relatively neutral if not cordial. Natalie claims the parties are "unable to resolve fundamental differences," citing their level of distrust, lack of communication, and Cory's behavior after the final custody order was entered. But the record does not support these allegations, especially to the degree that Natalie suggests. *Contra Dickey*, 2013 WL 1453067, at *5 (finding the parties "could [not] effectively manage an award of joint physical care" based on the "substantial volume of evidence that clearly displayed the near total breakdown of their personal relationship"). Instead, the record depicts two frustrated parties whose co-parenting relationship plummeted in the throes of a custody dispute. *See Hensch v. Mysak*, 902 N.W.2d 822, 826 (Iowa 2017) (finding "communication difficulties and tension must rise above the not atypical acrimony that accompanies litigation in family-law matters" to support a finding against joint physical care). Before these proceedings, there were significant moments where the parties co-parented well. The two have previously shared caregiving duties, Cory cooperated with overnights for Natalie to breastfeed, and Natalie has at times given Cory additional parenting time.

But the parties' relationship is far from perfect. The district court was "troubled by the lack of respect" and "the controlling behavior of the parties, Natalie more than Cory." It placed "the lion's share of the blame for the conflict" on Natalie, who it believed "reacted with outsized vindictiveness to the arrival of [Cory's new girlfriend]." It also found that "Natalie's rigid (and self-serving) adherence to routine, at the obvious expense of H.R.'s relationship with Cory, is harmful to H.R." While this conflict may support a finding of physical care with one parent, part of our analysis is to determine whether the "parent can support the other parent's

relationship with the child." Iowa Code § 598.41(3)(e) (2022), *see also id.* *§§* 598.41(1)(c) (requiring the court to "consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent" in determining custody), 600B.40(3) (applying section 598.41 to custody and visitation determinations for parents who were never married). We share the district court's concern about Natalie's ability to support Cory's relationship with H.R. if she is granted physical care. But despite these concerns, the record indicates the two can communicate and work together effectively in a joint-physical-care arrangement.

Finally, we look to "the degree to which the parents are in general agreement about their approach to daily matters." *Hansen*, 733 N.W.2d at 699. This obviously does not require absolute agreement, but "the parents must generally be operating from the same page on a wide variety of routine matters." *Id.* Natalie specifically cites the parties' busy schedules, geographical distance, and conflicting parenting styles as evidence that joint physical care will not be in H.R.'s best interests. But we do not fault parents for having nontraditional work schedules. *See Berning*, 745 N.W.2d at 94. And even if we had granted Natalie physical care and Cory visitation, the "physical care arrangement would still need to be adjusted to accommodate [Cory's] work schedule." *Id.* As for the distance, we agree with the court that the "logistical difficulties" "do not appear to be insurmountable." A forty- to forty-five-minute commute does not convince us of the need to disrupt H.R.'s caregiving relationship with his father. Lastly, in regard to their parenting styles, we find they are not as different as Natalie claims. While Cory is described as "the fun dad" and Natalie the keeper of routine, they are both

capable caregivers. They provide for H.R.'s basic physical and emotional needs; have their own routines at each household including bath, bed, and playtimes; agree on the fundamental decisions, such as H.R.'s future school district; and show real concern for H.R.'s well-being. "Each parent clearly cares a great deal for the child[] and wishes to spend the maximum amount of time possible with them." *In re Marriage of Toop*, No. 19-0543, 2020 WL 110352, at *3 (Iowa Ct. App. Jan. 9, 2020). We therefore find that the parties' parenting approaches support a finding of joint physical care.

We also note that the *Hansen* factors "are not exclusive, and the court must consider all the circumstances of the case," including "emotional bonds between the parents and children." *Id.* (citing *Hansen*, 733 N.W.2d at 699–700). We find that H.R.'s familial relationships further support the finding of a joint-physical-care arrangement. H.R. has an "affectionate" bond with C.R., who "loves teaching [him] all sorts of things." One witness testified that H.R. is "always wanting to be around [C.R.], and he's always wanting to be around Cory." H.R. has also developed bonds with Cory's girlfriend and her children. Traci testified her children sing songs to H.R. and play with him. We find that fostering, not disrupting, such familial relationships is in H.R.'s best interests. *See Hansen*, 733 N.W.2d at 696.

### B. Appellate Attorney Fees.

Finally, both parties request appellate attorney fees. An award of attorney fees is not a matter of right but is a matter of discretion. *See Christy v. Lenz*, 878 N.W.2d 461, 469 (Iowa Ct. App. 2016). "In determining whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation

omitted).  After considering the relevant factors, we decline to award appellate attorney fees to either party.

## IV.     *Disposition.*

Because joint physical care is in the child's best interests, we affirm the court's custody order.

**AFFIRMED.**