**IN THE COURT OF APPEALS OF IOWA**

No. 24-1437
Filed July 2, 2025

**MICHAEL J. DAVIS,**
        Plaintiff-Appellee,

**vs.**

**DANIELLE M. LADENTHIN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Plymouth County, Robert D. Tiefenthaler, Judge.

        A mother appeals a custody decree placing the parties' child in the father's physical care. **AFFIRMED.**

        John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant.

        Jenny L. Cleveringa of Klass Law Firm, L.L.P., Sioux Center, for appellee.

        Considered without oral argument by Ahlers, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

Michael Davis and Danielle Ladenthin, who were never married to one another, share one child together—a daughter, born in 2013. Michael petitioned for custody, visitation, and child support in early 2022, when Danielle refused to let him see their child after a dispute about exchanging the child on Christmas. In determining which parent should have physical care of the child, the district court weighed Michael's distant criminal history—which included a felony domestic abuse assault on Danielle—against Danielle's recent series of unhealthy relationships, denials of visitation, and the effect of both on the child. After doing so, the court concluded that it was in the child's best interests to be placed in the parties' joint legal custody and Michael's physical care. Danielle appeals the physical-care determination.

## I.     Background Facts and Proceedings

Michael and Danielle met in 2012. They moved in together the next year when Danielle became pregnant. Their daughter was born in 2013, and the family lived together until 2016 when the couple broke up.

Michael did not handle the end of the relationship well. In March 2016, he broke into Danielle's home in the middle of the night and assaulted her. Michael was arrested and charged with domestic abuse assault by strangulation causing bodily injury. He pled guilty to that charge as a habitual offender and was sentenced to a suspended indeterminate term of fifteen years in prison, with a three-year mandatory minimum. A criminal no-contact order was entered for five years.

Ten days after his sentencing in September, Michael violated the no-contact order. He was also charged with his sixth operating-while-intoxicated offense. Michael violated the no-contact order again in February 2017 and picked up another charge for operating while intoxicated. The district court revoked Michael's probation in June and ordered him to serve the previously imposed prison sentence. Before Michael went to prison, Danielle asked the court to terminate the no-contact order so that he could have visits with their daughter while he was incarcerated. The court granted Danielle's request, and Michael saw the child nearly every weekend during his incarceration.

In October 2018, Michael was released on parole and almost immediately began having visits with the child every weekend. He also found full-time employment, secured stable housing, and maintained his sobriety. In 2020, Michael married a woman named Mandy, who he had been dating since before he went to prison. In addition to his full-time employment at a hotel, Michael also helps Mandy run a daycare business. Michael discharged his probation in August 2022 and has had no arrests or criminal convictions since he went to prison. As Michael's life stabilized, Danielle's grew more chaotic, and Michael became concerned about her relationships, drug use, and care of their daughter.

After separating from Michael, Danielle was in "seven or more" relationships with men who had "all been incarcerated or in federal prison." One of those men sent Michael text messages repeatedly calling the child "retarded," among other offensive names. Another boyfriend, whose street name was "Yako," posted a video of himself in Danielle's apartment rolling a blunt, smoking marijuana, and talking about shooting people. He also posted a picture of himself holding a semi-

automatic firearm (even though he is a felon). A week after that picture was taken, he was charged with felony weapons distribution. In January 2021, Danielle's sister called the police because she was worried that Yako was assaulting Danielle. When officers arrived at Danielle's apartment, Yako answered the door to the apartment. Danielle was standing behind him mouthing, "help me." But Danielle told the officers that she did not want Yako to be arrested because he was out on bond that she had posted. Police also investigated reports from neighbors about "a strong odor of marijuana" coming from Danielle's apartment. And Michael and Mandy reported that they smelled marijuana on the child after picking her up from Danielle.

The child told Michael that she is "scared when the different boyfriends are over." She also said that Danielle and her friends would sometimes ask her to go to her room while they smoked marijuana. And the child told Michael about a time when she had to wait for Danielle at the bus stop for over an hour when it was below freezing outside. The child peed her pants while she was waiting and said that Danielle "screamed at her," which, according to Michael, is how Danielle usually disciplined the child and her older half-siblings.[1]

These issues came to a head on Christmas in 2021 after an argument about when to exchange the child. After that dispute, Danielle refused to let Michael see the child. So he petitioned to establish custody, visitation, and child support in January 2022. Danielle continued to withhold the child from Michael until the

---

[1] While these proceedings were pending, the child told her therapist that Danielle had given the child's older sister a bloody nose. The therapist made a report to the Iowa Department of Health and Human Services, but it was not confirmed.

weekend before the temporary hearing in March—a period of almost ninety days. After the hearing, the district court placed the child in the parties' temporary joint legal custody and Danielle's physical care, with alternating weekend visitation for Michael, plus every other Thursday night until Friday morning. Although the court ordered the parties to split the transportation duties, Michael assumed responsibility for most of the driving because Danielle would often refuse to meet him.

The case proceeded to trial about a year later—in May 2023. But Danielle, who was representing herself, did not appear because she "mixed up [the] court times accidentally." Michael was there, and after he presented his evidence and witnesses, the district court took the matter under advisement. Immediately upon discovering her mistake, Danielle filed a letter asking for a new trial date, which Michael resisted. The court granted Danielle's request in part, ordering that it would "restart the trial from where it concluded to allow both parties to continue the presentation of their evidence." Danielle hired an attorney to represent her, and the second half of the trial was held in August.

In its custody decree the following August, the district court found that Danielle's testimony was not credible on several issues, including "her romantic relationships." While the court found that Michael's assault on Danielle was "reprehensible," it concluded "that rehabilitation has worked for Michael and has allowed him to become the father that [the child] deserves." In contrast, the court found that "Danielle continues to make choices of having significant others in her life that are not only unhealthy for [the child] but are also a risk to [the child's] safety." The court also weighed Danielle's "unwillingness to cooperate with

transportation" and her pattern of "withholding visitation from Michael" in its physical-care determination. In the end, the court found it was in the child's best interests to be placed in the parties' joint legal custody and Michael's physical care.

## II. Standard of Review

We review physical-care determinations de novo. *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017); *see also* Iowa R. App. P. 6.907. Despite our de novo review, we "afford deference to the district court for institutional and pragmatic reasons." *Hensch*, 902 N.W.2d at 824. This means we give weight to the court's fact findings, especially when considering the credibility of witnesses. *Id.*; *see also* Iowa R. App. P. 6.904(3)(g).

## III. Analysis

Danielle claims the court erred in denying her request for physical care because she was the child's primary caretaker, which she contends "is the most significant factor in the determination of physical care, and outweighs any of the concerns raised by Michael." While that is an important factor, it is not the most significant one. Our foremost consideration is the best interests of the child. *See* Iowa R. App. 6.904(3)(n); *Hensch*, 902 N.W.2d at 824. And our objective is to place the child in the environment most likely to bring the child "to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 698 (Iowa 2007).

In determining which physical-care arrangement is in the child's best interests, we are guided by the factors in Iowa Code section 598.41(3) (2022) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). *Hansen*, 733 N.W.2d at 696; *see also* Iowa Code § 600B.40(2) (directing the court to apply

section 598.41(3) in non-dissolution custody cases). "Although our court recognizes greater primary care experience as a factor to be considered, it is not dispositive." *Flick v. Stoneburner*, No. 15-1930, 2016 WL 2743449, at *2 (Iowa Ct. App. May 11, 2016) (collecting cases placing a child in the physical care of the parent who was not previously the primary caretaker). "Instead, we consider whether the party requesting physical care has been an 'active and interested parent since [the child's] birth.'" *Pieper v. Gable*, No. 24-0868, 2025 WL 856765, at *2 (Iowa Ct. App. Mar. 19, 2025) (quoting *In re Marriage of Berning*, 745 N.W.2d 90, 93 (Iowa Ct. App. 2007)); *see also* Iowa Code § 598.41(3)(d).

Despite his sixteen-month incarceration, Michael has been an engaged parent and a steady presence in the child's life since she was born. Although the child resided primarily with Danielle before these proceedings, Michael testified that he had visitation with the child nearly every weekend—before, during, and after his imprisonment. In 2021, when Danielle had surgery to remove a tumor on her brain, he cared for the child for at least four weeks. And during the summer of 2023, the parties alternated care of the child every two weeks until school started. Danielle agreed that Michael and the child had a close relationship. Michael was involved with the child's education, medical needs, and extracurricular activities. He helped her with homework, set up counseling for her in May 2022, and signed her up for flag football. Michael had a consistent routine for the child in his home and, in addition to paying Danielle child support, provided for all her basic needs— "down to, like, socks and underwear." Because Michael has proven himself to be a capable caretaker, Danielle's historical role as the child's primary caretaker does not outweigh the concerns identified by the court, as Danielle contends on appeal.

*See Hansen*, 733 N.W.2d at 697 (noting there are circumstances that can "outweigh considerations of stability, continuity, and approximation"). Those concerns included Danielle's relationships and her failure to support Michael's relationship with the child.

We have stated that "if a parent seeks to establish a home with another adult, that adult's background and his or her relationship with the child[] becomes a significant factor in a custody dispute." *In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003). One reason for this is "because the type of relationship the parent has sought to establish and the manner he or she has established it is an indication of where that parent's priority for his or her children is in his or her life." *Id.* The record shows that Danielle has placed her relationships above the child's needs. For instance, when asked about her ex-boyfriend's text messages to Michael that called the child offensive names, Danielle testified, "he was probably trying to get under Mike's skin." The district court discounted that explanation, finding "no reason why [the ex-boyfriend] would talk about [the child] in such a manner, unless that is truly how he felt." We agree. And the record shows that, despite Danielle's denials otherwise, she was still in contact with that man before trial.

The court was also concerned about Danielle's relationship with Yako. While Danielle maintained they never lived together, the court found that Michael's exhibits showed Yako was smoking marijuana and in possession of a semi-automatic firearm in Danielle's home. Although the court stated it lacked sufficient evidence to conclude that Danielle was using marijuana, "she was at least allowing marijuana to be used by others around" the child. *See Winter*, 223 N.W.2d at 166

(considering the "nature of each proposed environment, including its stability and wholesomeness").  There were also concerns about domestic violence between Yako and Danielle.  The child told her therapist that she was worried about her mother's "many different or multiple boyfriends," that she had witnessed one of them physically abuse Danielle, and that she was scared in her mother's home. *See Thorpe v. Hostetler*, 949 N.W.2d 1, 7–8 (Iowa Ct. App. 2020) (finding mother's "rocky" relationship and "chaotic home life" weighed against keeping the child in her physical care in a modification action).  Danielle claimed Yako had not been in her home since January 2021, but the court did not find her to be credible.  Michael testified that he saw Yako's vehicle at Danielle's house the morning of their first trial date in May 2023.  And Danielle admitted that after Yako was released from prison, she and the child went to an arcade with him.

As for Danielle's ability to support Michael's relationship with the child, the court found that Danielle "denied Michael parenting time with [the child] for significant periods of time," including for close to ninety days after their dispute about the Christmas holiday.  *See* Iowa Code § 598.41(3)(e) (considering "[w]hether each parent can support the other parent's relationship with the child').  Danielle also, according to Michael, made transportation "a nightmare."  The temporary order required Danielle to pick the child up at the end of Michael's visitation, but Michael testified she only did that four times.  The rest of the time, Michael transported the child both ways.

"The ability of each parent to actively support the other parent's relationship with the child is an important factor in determining the physical [care] arrangement."  *In re Marriage of Manson*, 503 N.W.2d 427, 429 (Iowa Ct. App.

1993). Indeed, that ability is "instrumental in the successful mental, emotional, and social development" of a child. *Id.* Danielle's failure in that area supports the court's decision to place the child in Michael's physical care. *See In re Marriage of Shada*, No. 23-1912, 2024 WL 4222888, at *5 (Iowa Ct. App. Sept. 18, 2024) (collecting cases placing children with the historical non-primary parent due to the primary parent's inability to support their relationship).

After considering all the evidence and relevant factors, we conclude that Michael can provide the environment most likely to bring the child "to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. We accordingly agree with the district court that it was in the child's best interests to be placed in Michael's physical care.

**AFFIRMED.**