# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0848
Filed March 11, 2026

———————————

**Jeremy Arkenbout,**
Plaintiff–Appellee,
v.
**Jane Esther Kempenaar,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Jasper County,
The Honorable David Faith, Judge.

———————————

**AFFIRMED**

———————————

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West
Des Moines, attorney for appellant.

Donna R. Miller of Miller & Evans PLC, Des Moines, attorney for appellee.

———————————

Considered without oral argument
by Chicchelly, P.J., and Buller and Langholz, JJ.
Opinion by Buller, J.

**BULLER, Judge.**

Jeremy Arkenbout appeals from a ruling on his petition to modify custody of his two children, who were placed in the physical care of their grandmother Jane Kempenaar due to Jeremy physically abusing and neglecting them. The court denied Jeremy's request for physical care but appointed a reunification support person and provided a path toward unsupervised in-person visits between Jeremy and the children in the future. On our review, we affirm.

## BACKGROUND FACTS AND PROCEEDINGS

Twin boys were born to Jeremy and their mother in 2012. The mother died in 2015, and Jeremy retained custody of the children after her death. Virginia authorities removed the children from Jeremy's care in 2021 due to Jeremy's founded and confirmed history of physically abusing and neglecting them. Jane, the children's maternal grandmother, flew from Iowa to Virginia to supervise the children on a safety plan, as Jeremy could not be around them without full-time supervision. While on this safety plan, Jane observed Jeremy "punch[]" one of the boys "in the chest." In 2023, in a Virginia court, Jeremy and Jane entered a stipulated final custody order placing the children in their joint legal custody and Jane's physical care.

The Virginia order included a progression of steps to be taken before Jeremy would have more parenting time with the children. In Jeremy's view, he completed all these steps and thinks he should have automatically received physical care of the children once he "g[o]t [his] head straight." He was also unhappy with the amount of communication with the boys and from Jane about them. He blamed Jane for discussing the abuse with the boys, because he thought it "reinforc[ed] all of the negative trauma that [he] inflicted on them."

2

Following a convoluted procedural history we need not dwell on in this opinion, jurisdiction concerning custody and care was transferred to Iowa in 2024. For our purposes, the relevant filing is Jeremy's petition for modification of custody and care filed that June. He requested the court grant him physical care of the children and order Jane transfer to him the children's roughly $40,000 in social-security dependent death benefits she had saved.

In the approximately seven months preceding trial, Jeremy only exercised one of his seven allotted supervised visits. This one visit was essentially the only time the children were in Jeremy's physical presence since they were removed from his care in 2021. Jeremy largely could not explain why he had not exercised the other visits, though at times he blamed Jane, suggested she was not a good communicator, and accused her of thwarting his ability to spend time with the boys.

After previously repeatedly denying under oath in Iowa and Virginia courtrooms that he abused the children, the modification trial was the first time Jeremy ever meaningfully acknowledged that he beat, hit, and strangled the boys. As the district court put it, Jeremy's "story evolved over the course of the proceeding." He initially denied recalling specific acts of physical abuse but then acknowledged it must have happened since the children said it did. Only on cross-examination did Jeremy admit to specific acts of physical violence. The district court observed Jeremy's "reluctance" to do so and described the admission as "extracted painfully after lengthy cross-examination." The court later described Jeremy making these admissions "begrudgingly" and "disingenuously." Jeremy also admitted that, as far as the children knew, he had not taken any responsibility for the abuse—he had denied it for years and in the run-up to trial, and he even told them that their memories were false. According to Jeremy, placing the children in his care

would afford him an opportunity to acknowledge to the children that he had abused them.

Although there was some dispute at trial about Jeremy's level of engagement and desire to be part of the children's lives, the district court resolved several disputed fact questions adversely to Jeremy. It found his conduct outside of court did "not square with his alleged strong interest to parent his children." And the court found Jeremy had no regular contact with the children's counselors or school and only limited contact with Jane toward exercising his visitation. Based on these facts, the court found Jeremy's claim he was ready to be a full-time parent "not . . . credible." On at least some occasions, the court believed Jeremy was "simply saying what he thinks the court wants to hear." In the end, the court did not believe Jeremy had "truly taken accountability for his past actions."

The children have been doing reasonably well in their grandmother's care given their traumatic past. Even Jeremy admitted he could not provide superior care to Jane; just, in his view, "probably equal." The children have had some behavioral struggles, which the district court observed were "not difficult to understand given what they have endured."

In contrast to Jeremy's testimony, the district court found Jane credible, including her testimony that contact with Jeremy amplified the children's behavioral distress. She described how, during trial, one of the children had a panic attack, vomited, and had to be sent home from school due to stress related to Jeremy. She recalled how the children had been "panicky" and upset when Jeremy mentioned during a phone call that he would like to see them in-person; Jane had to "pick up the pieces" when Jeremy didn't follow through. And she described how Jeremy had in the past promised the boys he would attend a school event but never showed up.

From Jane's perspective, she had no issue with Jeremy's continued phone and video contact with the boys, except that she thought it might be positive for that contact to have therapeutic supervision. And she had no issue with monthly in-person visits, so long as they were supervised. She also told the court that, if it were not for her telling the children they would lose privileges if they did not participate, they would not agree to phone calls with Jeremy—or would hang up right away.

The court appointed a child and family reporter (CFR), who spoke with Jeremy, Jane, and the boys. In his conversations with the CFR, Jeremy essentially said he did not recall abusing the boys and wanted them back in his life. Following her conversation with Jane, the CFR observed that, since retiring in 2018, Jane "seems to have made tirelessly advocating for and caring for [the boys'] day-to-day needs her full-time job." And the CFR noted a behavioral specialist at the boys' school, despite occasionally disagreeing with Jane, said "that she would want an advocate like Jane on her side if she were in these children's shoes." In the CFR's conversation with the boys, they frankly described the abuse Jeremy perpetrated against them and were visibly nervous when they learned about the prospect of an in-person visit.

During a visit she supervised, the CFR observed an odd interaction between Jeremy and one of the boys. During the car ride after, the boy recounted to the CFR that he told Jeremy he wanted to stay in Iowa because he was still trying to recover from the "trauma" of the abuse; Jeremy apparently responded "what trauma?" which led the bewildered child to ask the CFR: "Doesn't my dad remember what he did to us?" Both of the boys asked the CFR why Jeremy wasn't in jail for what he did. In her own research into the Virginia cases, the CFR found the local prosecutor did not want to pursue charges once the children were in Iowa and away from Jeremy.

The CFR explained at trial that she saw no evidence Jane was "poisoning" the children against Jeremy or otherwise having a negative influence on them. To the contrary, the CFR observed that she had nearly believed Jeremy's statements to that effect, until she reviewed the Virginia court records[1] and interviewed the children's previous guardian ad litem, which clearly proved otherwise. The CFR ultimately recommended that the children remain in Jane's physical care and that Jeremy's visitation with them remain supervised. The CFR opined that, from her vantage point, even the phone and video visits "may be doing more harm than good."

The children have both consistently and expressly communicated that they wish to remain in Jane's care and would not feel safe with Jeremy. One of the boys, of his own volition, used time with his therapist to write a compelling letter to the court that detailed some of the abuse he experienced and explained he was "done dealing with someone who treats me like this"—referring to Jeremy's abusive conduct. A letter from the boys' physician similarly urged safety concerns regarding the boys' contact with Jeremy, the need for ongoing therapeutic supervision, and that any reunification process should move slowly.

Following contested trial, the court found Jeremy had not carried his burden to prove either prong of the modification framework: change in circumstances or superior ability to parent. But the court did adopt the CFR's recommendations to appoint a reunification support person and establish a path for eventual unsupervised visitation. Jeremy appeals.

---

[1] The CFR also noted that the Virginia court file included an order of protection prohibiting contact between Jeremy and the boys based on the abuse and neglect he inflicted. Our record does not contain an explanation for why that order was never registered or otherwise effective in Iowa.

## STANDARD OF REVIEW

We review petitions to modify custodial decrees de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015); *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017). We give weight to the district court's factual findings, particularly regarding the credibility of witnesses, but we are not bound by them. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). "The children's best interest is the controlling consideration," providing "the flexibility necessary to consider unique custody issues on a case-by-case basis." *Hoffman*, 867 N.W.2d at 32 (cleaned up).

## DISCUSSION

The district court found, and the parties on appeal do not dispute, that Iowa law concerning custodial modifications governs this action. We apply these familiar principles:

> To change a custodial provision . . . , the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody . . . must prove an ability to minister more effectively to the children's well being. The heavy burden upon a party seeking to modify custody stems from the principle that once custody of children has been fixed it should be disturbed only for the most cogent reasons.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). To determine who is better able to minister to a child's needs, we ask which custodian would "place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733

N.W.2d at 695–96 (applying statutory custody factors to a physical-care decision); *accord Hensch*, 902 N.W.2d at 824.

On our review of the record, we agree with the district court that Jeremy failed to carry his heavy burden to justify disturbing the custodial arrangement. First, we are skeptical there has been a substantial change in circumstances that is of a more or less permanent nature. Jeremy's mid-trial and seemingly partial acceptance of responsibility for abusing the children is of too recent vintage to serve as a permanent change. So too for his mixed track-record of seeking to participate in the children's lives, which is also undercut by the district court's credibility findings. Second, even if there were a substantial change in circumstances, Jeremy has not proven he is a superior caregiver. He admitted as much in his testimony. And we, like the district court, have serious concerns about whether Jeremy has meaningfully reformed from his past as a violently abusive parent. We also put weight on the children's strongly expressed preference, corroborated by multiple sources, that they would suffer if placed in Jeremy's physical care. *See In re Marriage of Hunt*, 476 N.W.2d 99, 101 (Iowa Ct. App. 1991) ("When a child is of sufficient age, intelligence, and discretion to exercise an enlightened judgment, his or her wishes, though not controlling may be considered by the court, with other relevant factors, in determining child custody rights."). Last, we agree with all involved that Jane as grandmother has done a remarkable job stepping up to care for the boys after the untimely death of their mother.

At heart, Jeremy has proven neither that circumstances have changed nor that he can provide superior care in comparison to Jane. And that means the district court correctly denied his petition for modification. For the same reasons—plus the deference we give the district court—we decline to tinker

with the visitation and supervision arrangements provided by the district court. The requirement that visits be supervised is more than reasonable given the history of this case.

As a penultimate observation, we acknowledge the scattered references in Jeremy's brief to parental preference. We are a bit skeptical that claim was preserved in the unique framework of this case—Jeremy did not argue below that anything different from the ordinary modification framework should apply, and Jane has custody, not just guardianship, of the children. But even if that preference applied and was appropriately considered by us on appeal, the preference is rebuttable and the evidence and testimony here certainly rebuts it. *Cf. In re Guardianship of J.Y.*, 968 N.W.2d 882, 900–01 (Iowa 2022). Jane is the only daily caregiver the boys have known for the last four years, and the time before that with their father was rife with abuse and neglect which remains unaddressed even today. We have no trouble concluding these facts override any preferential weight that should be given to Jeremy as the only surviving biological parent.

Finally, Jane asks for appellate attorney fees. Unfortunately, Jane does not cite any authority for us to award appellate fees, nor did her attorney file an appellate attorney-fee affidavit. *See In re Marriage of Samuels da Fonseca Silva*, 15 N.W.3d 801, 808 (Iowa Ct. App. 2024) (setting forth our preference to decide appellate-attorney-fee claims ourselves rather than having the district court do so on remand and discussing the necessity of attorney-fee affidavits for us to exercise our discretion). Given the failure to file an affidavit, the somewhat ambiguous legal basis for awarding fees, and our deference to the district court's fact-finding that Jeremy is of limited financial means, we decline to award appellate attorney fees to Jane.

**AFFIRMED.**