**IN THE COURT OF APPEALS OF IOWA**

No. 24-1635
Filed March 19, 2025

**IN THE INTEREST OF K.M. and K.M.,**
**Minor Children,**

**TAMMY BANNING,**
    Guardian ad Litem-Appellant,

**STATE OF IOWA,**
    Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, David F. Staudt,

Judge.

The attorney and guardian ad litem for the children and the State appeal the

juvenile court order dismissing a petition to terminate parental rights and deferring

permanency for six months. **AFFIRMED.**

Tammy Banning, Waterloo Juvenile Public Defender, Waterloo, attorney

and guardian ad litem for appellant children.

Brenna Bird, Attorney General, and Michelle R. Becker, Assistant Attorney

General, for appellant State.

Considered by Chicchelly, P.J., and Langholz and Sandy, JJ.

**CHICCHELLY, Presiding Judge.**

The attorney and guardian ad litem for the children (GAL) and the State appeal the juvenile court order dismissing a petition to terminate parental rights and deferring permanency for six months. The GAL also challenges the transition plan. Deferring to the juvenile court's credibility findings on the question of the children's best interests, we affirm the dismissal. We reject the claim that the juvenile court's transition plan does not account for the children's safety or best interests.

**I. Background Facts and Proceedings.**

The children's father was incarcerated when the juvenile court became involved with family, and he remained incarcerated throughout the proceedings. The children's mother was in the juvenile system as a child before living with her father. Her father died from cancer in September 2020 when the mother was sixteen years old, leaving her with little family support locally. She gave birth to her first child that October. The child was diagnosed with juvenile leukemia around the time of his first birthday. In February 2022, a few months after that diagnosis, the mother gave birth to her second child.

During 2022, the older child received a bone marrow transplant. To ensure the transplant is successful, the child needs prescribed medication dispensed on a strict schedule. Too little medication increases the risk of transplant rejection, while too much medication can damage the child's kidneys and liver. The medication also suppresses the child's immune response, leaving him vulnerable to illness.

In August 2022, the older child was hospitalized for moderate malnutrition, electrolyte imbalance, bilateral bronchitis, and pneumonia. A child abuse assessment was founded against the mother for denial of critical care and failure to provide adequate health care. On this basis, the juvenile court adjudicated both children as in need of assistance (CINA). The parties agreed to the older child's removal and placement in foster care, while the younger child was placed with the mother under the supervision of the Iowa Department of Health and Human Services (HHS). In May 2023, the younger child was removed and placed in foster care apart from the older child.

In August 2023, HHS reported that the mother was "struggling to meet her own basic needs," had no housing after being evicted, and was not consistently participating in services or visiting the children. Although the criteria for terminating parental rights would have been met for the older child, the younger child had only been removed from the mother for three months. The juvenile court's permanency order adopted HHS's recommendation to defer permanency for the older child for six months under section 232.104(2)(b).

By the December 2023 permanency hearing, the State, GAL, Court Appointed Special Advocate (CASA), and HHS were all recommending that the court order the State to petition to terminate parental rights. The mother asked the court for more time to comply with the case permanency plan. Although the court recognized that there was "a very legitimate argument that the State should be ordered to file a petition for termination of parental rights given [the mother]'s failure to successfully meet any of the requests of the court of [HHS]," it gave the mother "one last chance." But when the mother had made limited progress by the

February 2024 permanency hearing, the juvenile court directed the State to petition for termination of parental rights.

The State petitioned to terminate the mother's and father's parental rights under Iowa Code section 232.116(1)(e) and (h) (2024), and the juvenile court held a concurrent permanency and termination hearing in June. *See In re J.L.*, No. 20-1546, 2021 WL 1661235, at *2–3 (Iowa Ct. App. Apr. 28, 2021) (Tabor, J., specially concurring) (noting that the court may hold permanency and termination hearings at same time after providing proper notice to the parties). By then, the mother had begun a new romantic relationship and given birth to her third child.[1] The State, GAL, CASA, and HHS continued to recommend termination.

After the hearing, the court received a letter from the older child's foster parent, expressing concern that the hearing portrayed the mother in a negative light. She also stated her belief that the mother made progress during the past year and offered to continue caring for the older child until he can be returned to the mother. The court notified the parties that it intended to take the letter's contents into consideration as part of its termination ruling before granting the GAL's request for a hearing to fully develop information from both foster families.

At a July hearing, the older child's foster parent reiterated what she stated in her letter to the court. But the other foster parents disagreed with those sentiments. They believe the younger child had a strong bond with the mother when he came to live with them. But because of the mother missing visits, they

---

[1] At the time of the termination hearing, the mother's boyfriend had a job and provided housing for the mother and their child. HHS was not involved with that child.

were "not fully sure if he knows who she is anymore." Although the younger child was very timid and reserved when he first came to their home, they believe he now looks to them to meet his needs more than he does his mother. They noted the mother's missed medical visits and her inability to answer the doctor's questions or fill out paperwork for the child. They also described the younger child's progress while in their care, stating he is now a "loud active child" and "on track developmentally."

In October, the juvenile court entered an order dismissing the termination petition and deferring permanency for the children for six months. The court described how at the start of the CINA proceedings, the mother was a teenager living on her own with two children and no job and virtually no family support. It acknowledged that the mother "had a bad attitude toward [HHS] from the outset," was difficult to reach, and missed appointments. But the court found the mother's behavior was "somewhat understandable given her predicament":

> She is a young mother who had no supports and was dealing with a very, very seriously ill child. She did not have the normal supports that teenage pregnancies involve. She had no funds, no assistance from family and a lack of education concerning various outlets of assistance available. It is difficult to imagine a more exasperating and difficult situation than being without money and having a desperately ill child.

The court then noted that the mother is in a new relationship, her boyfriend is "gainfully employed," and they resided together with a new baby. It found that the mother "has made significant progress as evidenced by the reports and the statements of the foster parents" and "has stabilized with her new boyfriend," who provides stability for her and assistance with the children. The court acknowledged the mother did not utilize the six months granted her in the initial deferment of

permanency the way the parties had hoped and stated that she still "has a long road to travel to become an excellent parent." But it found the mother made significant improvements in the three to four months leading up to the termination hearing and is showing "the capability of caring for the children when given the opportunity and the now existing support."

> The Court particularly relies upon what it believes to be the most critical factors involved here in that [the mother] is not alleged to be using controlled substances or other illegal substances. It does not appear she has an alcohol problem. It does not appear she has any type of serious mental health concern. If she were to need to overcome any of the aforementioned concerns, the Court's opinion may well be different concerning termination of her parental rights. As the facts appear, she has made significant progress. She is providing a safe, sober and appropriate home for her new infant. There is no reason to believe that [the younger child] would not be able to reside with her in the near future. Once [the younger child] is settled in and a routine established, it is certainly within the Court's belief that [the older child] could also eventually be returned to her custody. . . .
> The Court does believe she has a bond with her children as she had custody of those children from their births prior to the removals. She has continued to have visitation with the children. The Court believes that a bond of this type should not be taken lightly and that given all of the facts and circumstances that [the mother] should have one last opportunity at providing the appropriate safe, sober and stable home for her minor children.

The court granted the mother and the father another six months to achieve permanency under section 232.104(2)(b). It stated its expectation that the mother "participate in 30-day home trial placements and that they be successful and that the children ultimately be returned to her care within . . . six months." The court found that if the children return to the mother's custody, termination of the father's parental rights would not be in the children's best interest because "he may step forward and be a satisfactory non-custodial parent" after he is paroled. The court dismissed the termination petition.

**II. Scope and Standard of Review.**

"We generally review CINA proceedings and termination of parental rights proceedings de novo." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). On de novo review, we review the facts and law and adjudicate rights anew. *Id.* Our primary concern is the children's best interests. *See id.*

**III. Discussion.**

The GAL and the State challenge the dismissal of the termination petition. They contend that clear and convincing evidence supports terminating the mother's and the father's parental rights under section 232.116(1)(e) and (h) and termination is in the children's best interests. They also contend that none of the situations described in section 232.116(3) weigh against termination and there is insufficient evidence showing that delaying permanency six months will eliminate the need for the children's removal. They ask us to reverse the juvenile court's order and terminate the mother's and father's parental rights to both children.

"Termination of parental rights under chapter 232 follows a three-step analysis." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). First, the court determines whether the State has established one of the grounds for termination set out under section 232.116(1). *Id.* If a ground for termination exists, the court must apply the best-interest framework in section 232.116(2) to decide whether it should terminate parental rights. *Id.* at 706–07. If termination is in the child's best interest, the court must consider whether any of the situations set out in section 232.116(3) should preclude termination. *Id.* at 707. After a termination hearing, the juvenile court must make and file written findings applying this analysis. Iowa Code § 232.117(1); *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010)

(stating that in ruling on termination petition, findings on section 232.116(1) and (2) "should be contained in the [juvenile court]'s decision").

Section 232.117 sets out the juvenile court's options for ruling on the termination petition depending on its findings. If the court finds the State failed to establish the grounds for termination by clear and convincing evidence, the juvenile court must dismiss the termination petition. *See* Iowa Code § 232.117(2). If the court finds there are sufficient facts to sustain the petition, the court may terminate parental rights and transfer guardianship and custody of the child, or it may adjudicate the child a CINA and enter an order under sections 232.100–.104. *See id.* § 232.117(3), (5).

The juvenile court's dismissal of the termination petition amounts to a finding that insufficient evidence supports the termination petition. The findings made within the ruling indicate that even if the evidence establishes at least one ground for termination, the court determined that termination does not serve the children's best interests. The evidence on this point is close. But we recognize the juvenile court's superior position in observing witnesses and making credibility findings:

> [W]hen we say a case is reviewed "de novo, this does not mean that we decide the case in a vacuum[] or approach it as though the trial court had never been involved." *Davis-Eisenhart Mktg. Co. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995). To the contrary, while not bound by the district court's findings, we give them weight and "defer[] especially . . . where the credibility of witnesses is a factor in the outcome." *Cookies Food Prods.*, 430 N.W.2d at 448; *see also* Iowa R. App. P. 6.904(3)(g) ("In equity cases, especially when considering the credibility of witnesses, the appellate court gives weight to the fact-findings of the district court, but is not bound by them."). This deference has pragmatic underpinnings. *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017). It is pragmatic because the district court has a front-row seat to the live testimony,

viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript. *See Davis-Eisenhart Mktg. Co.*, 539 N.W.2d at 142 ("Thus, '[e]ven though a case is tried de novo in this court, we have nevertheless repeatedly recognized that, where the testimony is conflicting, great weight is accorded the findings of the trial court, because the witnesses are before him and he is in a far better position to pass upon their credibility than is this court, which is limited to the printed record.'" (alteration in original) (quoting *In re Brooks' Estate*, 229 Iowa 485, 294 N.W. 735, 739 (1940))); *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court deciding dissolution cases 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.' In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented." (quoting *In re Marriage of Callahan's*, 214 N.W.2d 133, 136 (Iowa 1974))).

*Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (all but first alteration in original). The same judge who dismissed the termination petition has presided over the CINA proceedings since entering the adjudicatory order in September 2022. With the scales balanced on the issue of the children's best interests, the juvenile court's findings tip in favor of dismissing the petition. *See In re H.L.B.R.*, 567 N.W.2d 675, 679 (Iowa Ct. App. 1997) ("Where there is conflicting evidence on some issues, we give consideration to the juvenile court on issues of credibility.").

We affirm the dismissal of the termination petition on the record before us. Because the best-interests determination is a close one, time will reveal whether reunification is possible. While five months have passed since dismissal, the mother's performance during that period is beyond the record on appeal. Therefore, we express no opinion on the mother's present suitability as a parent or the outcome of any future termination proceedings.

Finally, the GAL argues that the juvenile court erred by ordering a transition plan without considering the children's safety and best interests.[2]  Because progressing through the stages of the transition plan is tied to the mother's performance and whether problems arise, we reject this claim.

**AFFIRMED.**

---

[2] The transition plan affords the mother visitation in stages with lessening supervision, followed by a home trial placement, and ultimately, returns the children to her custody.  The stages are staggered to begin with one child before lessening the level of supervision for the other child, and progressing to the next level of visitation depends on the mother's performance and whether problems arise.  The supreme court denied a request to stay the transition plan until resolution on appeal.