# IN THE COURT OF APPEALS OF IOWA

No. 23-1802
Filed March 19, 2025

IN RE THE MARRIAGE OF JEFFREY ADAM THOENE
AND KERRI LYNN THOENE

Upon the Petition of
**JEFFREY ADAM THOENE,**
    Petitioner-Appellee,

**And Concerning**
**KERRI LYNN THOENE, n/k/a KERRI LYNN WEBBER,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Stuart P. Werling,

Judge.

The wife in this dissolution-of-marriage proceeding appeals the district

court's decree granting the parties joint physical care of their child. **AFFIRMED.**

Katie M. Naset of Hope Law Firm & Associates, P.C., West Des Moines, for

appellant.

Maria K. Pauly of Maria K. Pauly Law Firm, P.C., Davenport, for appellee.

Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**AHLERS, Judge.**

Kerri Webber (formerly known as Kerri Thoene) appeals the district court's decree dissolving her marriage to Jeffrey (Jeff) Thoene. She only challenges the district court's decision to grant the parents joint physical care of their child (born in 2012). Kerri contends the court should have granted her physical care instead. Each party seeks an award of appellate attorney fees from the other.

## I. Standard of Review

We review dissolution-of-marriage actions de novo. *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). We give weight to the district court's fact findings, particularly as to witness credibility, but we are not bound by them. Iowa R. App. P. 6.904(3)(g). In making a physical-care determination, the child's best interests are our primary consideration. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). The goal is to place the child in the environment most likely to result in the child's good health and social maturity. *Id.*

## II. Physical-Care Determination

Jeff requested the court to grant the parties joint physical care of their child, while Kerri requested the court to grant her physical care. In determining whether joint physical care is in the best interests of a child, courts consider four key, although not exclusive, factors: (1) stability and continuity of caregiving (sometimes referred to as "approximation" of the historical caregiving arrangement); (2) the parents' ability to communicate with and show respect to each other; (3) the degree of conflict between parents; and (4) the degree to which parents agree about their approach to day-to-day matters. *Id.* at 696–99. We also

consider the factors listed in Iowa Code section 598.41(3) (2022) and those spelled out in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). *Id.* at 696.

Kerri contends the district court erred in awarding joint physical care of the child. She argues the balance of these factors strongly supports the conclusion that granting her physical care is in the best interest of the child.

As to the first factor, it is undisputed that Kerri was historically the primary caregiver for the child before the parties separated. Her flexible work schedule enabled her to meet the child's daily needs, such as school pickups, preparing dinner, and creating a schedule to track extracurricular activities. The child is heavily involved in competitive dance, which requires daily practices, weekend competitions, and occasional out-of-state travel. Kerri has consistently been the parent responsible for ensuring the child attends these events. While Jeff has remained involved in the child's life, his frequently changing work schedule and the need to work overtime to meet the family's financial obligations often prevented him from being as engaged in the child's day-to-day care.

After the parties separated, Jeff adjusted his work schedule so his hours were more conducive to raising a child without a partner's support. He loads up his overtime on the days he does not have the child in his care so he can attend to the child's needs when he does. This change in work schedule facilitated the parties' agreeing to a joint-physical-care arrangement while these proceedings were pending. The parties followed that joint-physical-care agreement for around seven months leading up to trial. While the parties certainly had hiccups along the way, they were able to effectively navigate joint physical care well enough to ensure the child's needs were being met during that time.

To the extent Kerri suggests that she had the child more days than Jeff even after the stipulation on temporary matters was filed and approved, we are not persuaded the minimal disparity in the number of days is consequential. We reach this conclusion partly because the disparity was caused to some degree by Kerri's sometimes overly strict enforcement of the parenting schedule—for example, calling the police on Jeff's parents when they came over to watch the child when Jeff had to work. In any event, exact equality is not required for joint physical care to work. *See In re Seay*, 746 N.W.2d 833, 835–36 (Iowa 2008) ("While joint physical care does require equal responsibility on routine, daily decision-making, it does not require that the residential arrangements be determined with mathematical precision."). We find the parties successfully maintained a workable joint-physical-care arrangement for the seven months leading up to the trial, and as long as both continue to put forth the same level of effort, we see no reason to change the arrangement based on the first factor.

The second and third factors focus on the relationship between the parties, centering on the level of conflict and the ability to communicate respectfully with one another. It is clear that both parties struggle with these factors, as evidenced by their arguments focused on criticizing one another over various issues. Some of the concerns raised are reasonable and relate to the child's well-being, while others are largely immaterial disputes that can frequently arise at the end of a relationship. Our review focuses on the communication issues we find most impactful to the child.

Kerri takes issue with the district court's critical analysis of her behavior and argues more consideration should have been given to Jeff's recent domestic

disturbances with his new girlfriend.[1]  We acknowledge this behavior by Jeff is concerning, but without more information in the record, we have limited knowledge on the details surrounding these events.  What is clear from the record is that none of these disturbances occurred in front of the child.  Conversely, Kerri instigated two instances that escalated to the point of police involvement in the presence of the child.  Kerri used the child to enter Jeff's home after the couple had been separated for over a year, leading to an altercation with his girlfriend that resulted in the police being called.  As previously noted, Kerri also called the police on Jeff's parents when they were at his home preparing to take the child to school, as she wanted to take the child to school herself.

Jeff and Kerri also struggle to communicate respectfully regarding the child's daily schedule.  Both are at fault in this regard.  Kerri puts significant effort into creating a schedule that accommodates both the child's and Jeff's challenging schedules, but he often has trouble understanding the details and frequently needs to ask questions.[2]  At times, both have been short, rude, or unhelpful in their communications, but these difficulties and tensions are not uncommon given the stress of managing a shared parenting relationship, especially during the litigation. *See Hensch v. Mysak*, 902 N.W.2d 822, 826 (Iowa Ct. App. 2017).  The parties have managed to overcome their communication struggles to ensure the child is

---

[1] At the time of trial, Jeff testified that he was no longer romantically involved with the woman, but he did acknowledge assisting her with animal care and allowing her to borrow his vehicle in the weeks leading up to the dissolution trial.

[2] To be clear, the onus of managing the parties' and child's schedules is not solely on Kerri.  Rather, as co-parents, the burden falls on Kerri and Jeff equally.  As a co-equal parent, Jeff should take steps to understand the child's schedule on his own rather than relying on Kerri to inform him.

cared for according to their agreed-upon schedule. While the conflict between the parties does raise some concern, the record shows the parties are capable of communicating and working together well enough to make a joint-physical-care arrangement work. *See id.* (noting that only tension and communication difficulties that go beyond typical acrimony that comes with family-law litigation is sufficient to demonstrate that joint physical care will not work).

Turning to the fourth factor, Kerri contends the parties fundamentally disagree on their approach to daily matters with the child. She cites Jeff's refusal to miss parenting time so that the child could attend one of her relative's birthday parties, but she overlooks instances in which she refused to give Jeff additional time with the child when he wasn't working. We do not view these situations as fundamental disagreements on raising the child, but rather efforts by each parent to spend as much time as possible with their child.

Both parties agree that the child is smart and outgoing, enjoys school with friends, and participates in several extracurricular activities. While Kerri takes issue with Jeff's questioning of how much time and money competitive dance requires and his struggle to understand the scheduling, both parties ensure the child always arrives at school and other events prepared and on time. The child has severe allergies, and both parties are prepared to manage emergency situations and have taken precautions in their homes to prevent such emergencies. The parties are not expected to be in absolute agreement, but rather a general alignment on routine matters such as the child's schedule, education, and discipline. *Hansen,* 733 N.W.2d at 699. Kerri and Jeff have demonstrated their ability to agree when it comes to the child's needs.

Despite some conflict between the parties, it is clear that both are loving parents who want the best for their child. The parties have demonstrated the ability to work together well enough to ensure the child's needs are met, and we believe this will continue. Following our de novo review of the record, we agree with the district court's decision to grant joint physical care to Kerri and Jeff, finding it to be in the best interests of the child.

## III. Appellate Attorney Fees

Each party requests an award of appellate attorney fees from the other. An award of appellate attorney fees rests in our discretion and is not a matter of right. *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). In exercising that discretion, we consider the needs of the requesting party, the other party's ability to pay, and the relative merits of the appeal. *Id.*

As to Kerri's claim, we recognize that she may have a need for an award and Jeff has greater ability to pay. But we also recognize that she is not the prevailing party. We decline to award Kerri appellate attorney fees.

As to Jeff's claim, his needs for an award are minimal due to his substantially greater income. Even though he is the prevailing party, we decline to award Jeff appellate attorney fees.

## IV. Conclusion

We affirm the district court's decree granting Kerri and Jeff joint physical care of their child, and we decline to award appellate attorney fees to either party.

**AFFIRMED.**